1

2

3

4

5

6

7

8                    UNITED  STATES  DISTRICT  COURT

9                      EASTERN  DISTRICT  OF  CALIFORNIA

10

11
    EDWARD LORENZO GUTIERREZ,        ) 1:10-cv—01014-LJO-SKO-HC
12                                    )
                   Petitioner,        ) FINDINGS AND RECOMMENDATIONS TO
13                                    ) DENY PETITIONER'S REQUEST FOR AN
                                      ) EVIDENTIARY HEARING (DOC. 24)
14       v.                           )
                                      ) FINDINGS AND RECOMMENDATIONS TO
15  GARY SWARTHOUT,                    ) DENY THE PETITION FOR WRIT OF
                                      ) HABEAS CORPUS (DOC. 1), DIRECT
16                 Respondent.        ) THE ENTRY OF JUDGMENT FOR
                                      ) RESPONDENT, AND DECLINE TO ISSUE
17  _____  ) A CERTIFICATE OF APPEALABILITY

18                              **OBJECTIONS DEADLINE:**
                                **THIRTY (30) DAYS**
19

20       Petitioner is a state prisoner proceeding pro se and in

21  forma pauperis with a petition for writ of habeas corpus pursuant

22  to 28 U.S.C. § 2254.  The matter has been referred to the

23  Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local

24  Rules 302 and 304.  Pending before the Court is the petition,

25  which was filed on May 18, 2010, and transferred to the Fresno

26  Division of the Court on June 7, 2010.  On February 7, 2011,

27  Respondent filed an answer with supporting documentation.

28  Petitioner filed a traverse on April 25, 2011.

                                     1

1    I.  <u>Jurisdiction</u>

2    Because the petition was filed after April 24, 1996, the

3  effective date of the Antiterrorism and Effective Death Penalty Act

4  of 1996 (AEDPA), the AEDPA applies in this proceeding.  <u>Lindh v.</u>

5  <u>Murphy</u>, 521 U.S. 320, 327 (1997), <u>cert.</u> <u>denied</u>, 522 U.S. 1008

6  (1997); <u>Furman v. Wood</u>, 190 F.3d 1002, 1004 (9th Cir. 1999).

7    A district court may entertain a petition for a writ of habeas

8  corpus by a person in custody pursuant to the judgment of a state

9  court only on the ground that the custody is in violation of the

10  Constitution, laws, or treaties of the United States.  28 U.S.C.

11  §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7

12  (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, –, 131 S.Ct. 13, 16

13  (2010) (per curiam).  Petitioner claims that in the course of the

14  proceedings resulting in his conviction, he suffered violations

15  of his Constitutional rights.  Further, the challenged judgment

16  was rendered by the Stanislaus County Superior Court (SCSC),

17  which is located within the territorial jurisdiction of the

18  Eastern District of California.  28 U.S.C. §§ 84(b), 2254(a),

19  2241(a), (d).

20    Respondent filed an answer on behalf of Respondent Gary

21  Swarthout, Warden of the California State Prison, Solano (CSP-

22  SOL), where Petitioner has been incarcerated at all pertinent

23  times during this proceeding.  Petitioner has thus named as a

24  respondent a person who has custody of the Petitioner within the

25  meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing

26  Section 2254 Cases in the District Courts (Habeas Rules).  <u>See</u>,

27  <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir.

28  1994).

Accordingly, this Court has jurisdiction over the subject matter of this action and over Respondent Swarthout.

II.   <u>Procedural Summary</u>

At a jury trial, Petitioner was convicted of committing the wilful, deliberate, and premeditated murder of Eduardo Negrete in violation of Cal. Pen. Code § 187 and using a knife in the commission of the offense in violation of Cal. Pen. Code § 12022(b).  Further, he was convicted of assault with a deadly weapon (a knife) on Fernando Figueroa in violation of Cal. Pen. Code § 245(a)(1) and misdemeanor assault on Elizabeth Figueroa Negrete in violation of Cal. Pen. Code § 240.  (2 CT 308-09.)

In the same trial, Petitioner's wife, co-defendant Charlotte Gutierrez (Charlotte), was convicted of the same charges with respect to Negrete's death.  She was also convicted of assaulting Fernando Figueroa with a deadly weapon (a baseball bat) in violation of Cal. Pen. Code § 245(a)(1) and assaulting Elizabeth Figueroa Negrete with force likely to produce great bodily injury in violation of Cal. Pen. Code § 245(a)(1).  (<u>Id.</u> at 309.) Petitioner was sentenced to twenty-seven years to life in prison. (<u>Id.</u> at 421-23.)

Petitioner appealed the judgment.  The Court of Appeal of the State of California, Fifth Appellate District (CCA) affirmed it.  (LD 5 at 1, 3.)[1]

Petitioner and Charlotte each filed a petition for review in the California Supreme Court (CSC).  On June 10, 2009, the CSC summarily denied review.  (LD 6; LD 7; LD 12.)

---

[1] "LD" refers to documents lodged by the Respondent with the answer.

III.   <u>Factual Summary</u>

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004).  This presumption applies to a statement of facts drawn from a state appellate court's decision.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).  The following statement of facts is taken from the decision of the CCA in <u>People v. Gutierrez</u>, case number F053655, filed on March 25, 2009:[2]

<u>FACTS</u>

In June 2005, Eduardo Negrete and his wife, Elizabeth Figueroa Negrete, lived with their four- and two-year-old daughters in a Turlock apartment complex. Elizabeth's brother, Fernando Figueroa, her sisters Araseli and Rubi, and Rubi's husband, Esau Viveros Sanchez, lived in another apartment in the same complex. Edward and Charlotte lived in a third apartment in the same complex with their toddler daughter. The families were acquainted with each other.

On the morning of June 15, 2005, a police officer came to the Negrete's door. Elizabeth saw Charlotte walking toward the door behind the officer and heard her say that her daughter was saying that Eduardo had molested her. The officer asked Charlotte to leave. After speaking to Eduardo, the police officer left.

Between noon and 12:30 p.m., Elizabeth and Eduardo left their apartment and walked to Eduardo's pickup truck. Eduardo entered the truck through the driver's side. As Elizabeth was about to get in from the passenger's

_____

[2] Because the copy of the CCA opinion submitted by Respondent is missing some pages, the Court will refer to the printed version of the decision appearing at <u>People v. Gutierrez</u>, 2009 WL 765680 (No. F053655, March 25, 2009).

4

side, Edward, who was holding a knife and a bat, ran toward the driver's side of the truck, making growling sounds like he was angry, and struck the driver's side window with the bat, shattering the window. Eduardo told Elizabeth to call the police and got out of the truck through the passenger's side.

Fernando, Esau, Rubi and Araseli, who were inside various apartments in the complex, all heard a loud noise and ran outside. Eduardo had run from the pickup truck to the street, followed by Edward. Elizabeth was nearby. Eduardo put his hands up and said "[S]top, stop. Let's talk." According to Elizabeth, Edward said nothing and swung the bat at Eduardo, hitting him two to three times on the back of his neck. Eduardo attempted to defend himself, eventually falling to the ground. During the struggle, the bat fell. Edward then stabbed Eduardo twice behind the right ear. Around the same time, Charlotte appeared and picked up the bat, saying "he deserves it. He molested my daughter." FN4

> FN4. According to Rubi and Araseli, Edward
> was holding only the knife when he ran out
> into the street after Eduardo, while
> Charlotte was holding the bat.

Eduardo yelled "Help me, Fernando." Fernando came toward Eduardo, but before he could do anything, Edward stabbed Eduardo in the stomach with the knife. Fernando tried to take the knife from Edward, but Edward turned toward Fernando and thrust the knife at him, stabbing him in the left hand, left leg and ankle. Charlotte struck Fernando in the back of his head and down towards his neck with the bat. Fernando was dizzy as a result of the stabbing.

Eduardo got up. Rubi yelled "... run to the house." Charlotte was in the middle of the parking lot yelling "Kill him because he's guilty." Eduardo entered Rubi's apartment, jumping over a child safety gate. Esau ran after Eduardo and he tried to remove the gate and close the apartment door. Edward, still carrying the knife, ran to the apartment and stabbed at Esau, scratching his shirt. Esau tripped and fell. As Edward ran into the apartment, he pushed one of Esau's and Rubi's sons into a television.

Charlotte followed her husband into the apartment, carrying the bat. She removed the safety gate and pushed one or both of Esau's and Rubi's children outside the apartment. Charlotte remained at the front door, blocking it. When Fernando tried to enter the apartment, she swung the bat back and forth and said: "[N]o, no, no. Let him kill him. Let him kill him. He deserves it. He deserves it," and "he has to kill him."

After Charlotte left the front door, Fernando, Elizabeth and Rubi ran through the apartment to the back door, where they saw Charlotte with her right hand on the back door; she was swinging the bat back and forth in her left hand, telling them to stay inside. Elizabeth believed Charlotte hit her in the back with the bat, bruising her. They looked out the back door and saw Eduardo lying on his back on the ground on the patio with Edward on top of him, stabbing him in the chest with the knife.

Araseli, who had been pulled into the apartment next to Rubi's by one of the neighbors, went out the back door of that apartment and climbed on top of a garbage can. She threw a broom over the fence at Edward, which missed him. Rubi said "No more, no more." Edward told her to be quiet or he would kill her. She backed away when Edward made a stabbing motion toward her. Elizabeth grabbed Edward by the neck and tried to pull him off her husband, saying "no more, no more." He placed the knife point on Elizabeth's chest, said "I'm going to kill you too," and knocked her away. She fell against the back fence, breaking one of the panels. Later, she discovered she was scratched and her foot had been cut. Charlotte yelled out, "No, not her. Kill him." She swung the bat at Fernando five to ten times, but did not hit him. She walked over to Eduardo and struck him on the feet and in the face with the bat. Fernando moved towards Eduardo and took the bat from Charlotte. When he did so, Edward turned the knife on Fernando, telling him he was next.

Charlotte and Edward turned and walked back into the apartment. On the way out, Charlotte said "he killed him now" or "I'm happy now, because the one I wanted killed has now been killed." Fernando followed the couple outside. Charlotte walked to her apartment while Edward, still holding the knife, walked to his car and got in. Fernando hurled the bat at Edward's car as he drove away.

*Police Response and Crime Scene Investigation*

Turlock Police Department officers and emergency personnel arrived on the scene a short time later, finding Eduardo dead on the patio behind Rubi's apartment. He had suffered a total of 42 stab wounds, 14 of which were potentially lethal. The stab wounds, which were consistent with the configuration of a fixed-blade knife, ranged from two to six inches deep and major organs were perforated. According to the pathologist, the wounds were mostly offensive ones, i.e. inflicted by someone else, and the pattern of the wounds showed they were intentionally inflicted. The pathologist did not find any injuries consistent with a

baseball bat.

Eduardo's pickup truck was found parked in the carport outside his apartment, with the driver's side window broken. Blood drops and spatter trailed from the walkway outside Rubi's apartment into and through the apartment, inside the back door, and into and onto the back patio where Eduardo was found. The trail suggested someone was losing blood and moving slowly, and at some points, that the person was stationary for a period of time. One of the fence panels in the rear patio was broken. A 20-ounce, 29-inch metal baseball bat was found near a fence at the apartment complex. The base and head of the bat were damaged, and the bat was covered in what appeared to be blood residue. The price tag sticker from a sporting goods store was still on the bat. The damage to the head of the bat was consistent with it being used to break a vehicle's window.

*Edward's and Charlotte's Arrests*

Police pursued Edward, who was driving from the area at a high rate of speed. After a three-minute chase, the police were able to force Edward to stop. He had a "large amount of blood" on his clothing, hands and arms, and a number of lacerations and contusions. The inside of his car was bloody and a seven inch fixed-blade military knife, covered with blood residue, tissue and dried hair, was on the floorboard under the driver's seat. Inside his wallet was a receipt from the same sporting goods store as the price tag sticker on the bat, dated June 15, 2005, at 11:51 a.m. The receipt was for a fixed-blade military knife, a sharpener with case, and a bat. A checkbook was found on the driver's seat, with a check stub in it. Police also found in Edward's clothes a baseball bat wrapper with a bar code on it that retail businesses commonly use to track inventory. An officer involved in Edward's pursuit and arrest testified that Edward did not answer his questions and seemed "unresponsive."

A check of receipts from the sporting goods store revealed the record of a purchase matching the receipt from Edward's wallet. The store clerk who made the sale could not identify the purchaser, but remembered it was a Hispanic male who was alone and knew what he wanted. The male purchased a bat, a knife and a sharpener, and paid with a check. The entire transaction took about 20 minutes.

Meanwhile, a Turlock Police Department patrol supervisor responded to the scene at 12:40 p.m. and went to Charlotte's apartment to talk to her. She was wearing a white t-shirt and black pants. There were

blood smears on the t-shirt, and also on her face, arms and hands. The packing for a fixed-blade military fighting knife and the knife's sheath were sitting on the kitchen table inside the apartment. A knife sharpener and its packaging were sitting on the floor beside the table, along with a bag from the same sporting goods store from which the receipt found in Edward's wallet came. The window blinds were open; visible through the blinds were the Negrete apartment and the carport where Eduardo's truck was parked. The patrol supervisor who arrested Charlotte described her mood as swinging from one extreme to another; at times she was irate, excited and hysterical, while at other times she was calm and collected.

*Forensic Evidence*

DNA testing was performed on blood swabs or samples taken from Edward's dark blue t-shirt and denim blue jeans, Charlotte's white t-shirt, the knife and the bat, and were compared to reference samples taken from Eduardo, Elizabeth, Fernando, Charlotte and Edward. Two of the presumptive blood stains on Edward's t-shirt matched Eduardo's known reference sample profile. The stains on Edward's jeans contained Edward's profile. Blood stains on Charlotte's t-shirt matched Fernando's known profile. Testing on the presumptive blood on the bat's handle revealed two donors-90 percent of the sample matched Edward's DNA profile, while the remainder matched Fernando's profile. Testing on the presumptive blood on the middle of the bat revealed a mixture of donors-the majority donor matched Fernando's profile, and Edward and Elizabeth could not be excluded as donors of the minority profile. Testing on the knife revealed a mixture. Eduardo was believed to be the source of the largest genetic profile found on the knife's blade. The DNA on the handle was mixed half and half; Edward and Eduardo could not be excluded as possible contributors to these mixtures.

Police purchased a new fixed-blade knife, knife sharpener and bat for comparison to the fixed-blade knife, knife sharpener and bat that were found in Edward's car and apartment. Turlock Police Detective Brandon Bertram visually compared the found knife and sharpener to the purchased items. He testified that the knife found in Edward's vehicle "appeared to be sharpened on both sides of the knife blade" as the knife showed recent wear consistent with the straight edge of the knife and the black concave surface at the knife's tip being sharpened. He also testified that the knife sharpener found in Edward's apartment had discoloration consistent with the black paint present on the purchased knife.

8

Department of Justice tool mark expert James Hamiel testified that based on his microscopic examination of the found and purchased knives, as well as his consultation with the company that made them, he concluded the epoxy on the top of the "false edge" of the found knife had been removed by a hand process. Although there were numerous irregularly placed scratch marks along the false edge and the epoxy at the false tip had been removed, he did not see any tool marks on the found knife that could be associated with the knife sharpener and therefore opined the found knife had not been sharpened after the factory processes were applied to it. He also compared the found and purchased knife sharpeners. The found sharpener had some gray-black smears on the sharpening rod area which were not on the purchased sharpener; the smears were similar in color to the epoxy on the knife. According to Hamiel, the false edge of the found knife was not sharp, did not "form a cutting edge," and had not been sharpened after purchase. He did not perform a comparison of the found sharpener and the black epoxy coating, and was not able to determine what the found sharpener came into contact with, although it could have come into contact with another knife.

*Edward's Defense Case*

Harold Lee Seymour, Ph.D., a licensed psychologist the defense retained to perform a psychological review of Edward, examined Edward in November 2006 and reviewed various reports provided by Edward's counsel. Dr. Seymour concluded Edward suffered from recurrent type major depression of moderate severity without psychotic features, which was exacerbated by his financial problems, his devotion to his daughter and his inability to protect her. In Dr. Seymour's opinion, Edward's actions on the day in question were impulsive, as shown by his not taking steps to reduce the chance of being caught and his having reached the point where adrenaline and rage took over. Dr. Seymour explained that Edward was pushed to confront Eduardo because he was upset over what "he perceived as his daughter's molestation" and he was afraid of what Eduardo might do; after that point, Edward's actions were based on impulse.

Edward, who testified on his own behalf, stated that he loved and spoiled his daughter, who he did not think could tell a lie. A week before the stabbing, she had a nightmare where she cried out "[s]top touching me." She had a second nightmare on June 15, after which she told Edward her friend's father, Eduardo, had touched her and she had seen "his spider," which was his daughter's word for hair. Edward concluded she had seen the hair on Eduardo's private parts. Edward felt sick and angry,

and decided to take the day off from work.

His wife, Charlotte, called the police and an officer named Briggs arrived at their apartment. Charlotte told the officer about their daughter's nightmares and that she told them she was touched in her private areas. The officer talked to their daughter for about an hour and went to Eduardo's apartment. When the officer returned, he told Edward and Charlotte that he spoke with Eduardo, and he denied touching their daughter and seemed very upset and mad at Edward. The officer also told them they could take their daughter to a hospital to have her checked, but there was nothing more he could do. Edward was very upset, heartbroken and angry, and also concerned about his family's safety because he did not know Eduardo, did not trust him, and didn't know if he had weapons or would retaliate against him.

Edward and Charlotte took their daughter to a hospital emergency room. The doctor examined their daughter and told them it did not appear she had been penetrated. He referred the family to a children's hospital for further examination, and made an appointment for them. Edward was disappointed, frustrated and angry.

The family returned home. Charlotte went upstairs and made phone calls, while Edward "took off by myself" to buy protection for his family. Edward went to the local sporting goods store; he wasn't sure what he was going to buy, but knew the store would have something for protection. He grabbed a baseball bat, the smaller of two knives he saw, and "out of habit" grabbed a knife sharpener, which was "[j]ust something that came with" the knife. He wrote a check for the items, which totaled $110.53, and drove home. The knife he bought had a "blood groove" on it, which Edward explained is a cutaway in the knife's side which allows air to get on the blade so it's more effective.

When he got home, he went to the kitchen table and opened the packages for the knife, bat and sharpener. He wasn't familiar with the particular style of the knife sharpener, so he grabbed the knife and sharpener and "was scraping the sharpener on the knife to get a feel for it." He put the sharpener down because he didn't like the way it felt. He was not trying to sharpen the knife, which was already sharp; he just wanted to test the sharpener to see how it would feel in his hands. Edward said he did not tell Charlotte that he was going to get a knife or show the knife to her when he got home.

A shadow going across the front lawn caught his attention; he looked out the window and saw Elizabeth pass by, casting a second shadow. He grabbed the bat

10

and knife and ran out the front door. He saw Eduardo get into his truck and wanted to confront him to try to get him to apologize to his daughter and confess the molestation. He broke the truck's window because he saw Eduardo look up at him and lock the truck's door. Edward was "very angry" and wanted to die; he didn't think he could control himself at that point.

After Edward smashed the window, Eduardo ran out into the street, followed by Edward, who was still holding the knife and bat. Eduardo grabbed the bat from him and Fernando started kicking and punching Edward. Edward hit the ground and the knife fell out of his hands. Eduardo was hitting him with the bat, Fernando kept kicking him, and another person was hitting him from behind. Edward and Fernando fought to get the knife; Fernando cut himself during the struggle. Eduardo ran toward the apartments, followed by Edward. Edward followed Eduardo into one of the apartments; Edward saw a toddler in the apartment, but denied touching him. Eduardo went out the back door, followed by Edward, and the two began wrestling on the patio. Edward grabbed the knife and started stabbing Eduardo, even after Eduardo was on the ground. Edward said he "went crazy" and "wasn't thinking" about what he was doing, he just keep stabbing anywhere he could. Edward left the apartment, went to his car, threw the knife on the floorboard, and drove away. The police eventually stopped him and took him to a hospital.

Edward spent about eight and a half years serving in the army, which included time in army reserves, active army and National Guard. He was in the basic infantry and also worked as a mechanic, and was honorably discharged.

Edward's sister and step-son both testified that Edward was not a violent person.

*Charlotte's Defense Case*

Charlotte, who testified on her own behalf, stated that her then three-and-a-half-year-old daughter began having repeated nightmares about a week before the stabbing. When Charlotte questioned her daughter about a nightmare she had on the morning of the stabbing, her daughter, who used the word "spider" to refer to hair, said that Eduardo had touched her and he had a "big spider right there," pointing to her crotch. Her daughter said Eduardo put his hand on her crotch and it hurt, and that Eduardo's daughter "kissed her daddy's spider."

Charlotte called 911 shortly after 7:00 a.m. and Tulare Police Officer Kim Briggs responded to their apartment.

According to Charlotte, Officer Briggs attempted to talk with her daughter, but she refused to speak with him. Charlotte admitted that her daughter eventually did speak to Officer Briggs, but answered "no" to all of his questions and hid from him. Officer Briggs then went to Eduardo's apartment, which Charlotte pointed out to him, and knocked on the door. Elizabeth answered. Charlotte testified she followed Officer Briggs to the door, but denied he told her to leave and said she left voluntarily. When Officer Briggs returned to their apartment, he explained that Eduardo adamantly denied the charges. He called child protective services, but they could not get involved because the molestation did not occur in the Gutierrez's home. Officer Briggs told Charlotte there was nothing else that could be done and left.

Charlotte and Edward immediately took Charlotte to the emergency room of a Turlock hospital, checking in at 8:40 a.m. A doctor examined their daughter. Charlotte did not remember the doctor telling her the examination was normal, but he made an appointment for their daughter the following day at the children's hospital in Madera. The family returned home and Charlotte went upstairs. At approximately 11:30 a.m., Charlotte called the landlord, who said she could not do anything. Charlotte then called and made an appointment with a therapist.

When Charlotte came downstairs, she saw her husband run out the front door to Eduardo's truck. Although she did not see anything in his hands, she saw him break the truck's window and then chase Eduardo into the street. She went outside and saw her husband on top of Eduardo, stabbing him. She moved closer and saw Esau kicking her husband and a young boy hitting her husband with a bat. She screamed at her husband to stop. She pushed the boy with the bat away and grabbed at her husband, but he pushed her back. Eduardo got up and ran away. Charlotte denied having the bat when she ran into the street and denied hitting Fernando with the bat. She did not know how Fernando's blood got on her t-shirt.

Charlotte ran back to the apartment to check on her daughter, screaming for help and that her daughter had been molested and her husband was stabbing the molester. She did not have the bat. Eduardo and "the family members" ran into an apartment. Charlotte ran in behind them and saw her husband on top of Eduardo, stabbing him. She was screaming, trying to stop it, but she was unable to do so. Charlotte ran back to her apartment and called 911 at 12:34 p.m. She told the dispatcher her husband was stabbing the neighbor and her daughter had been molested.

12

The apartment manager testified that Charlotte called
her twice on the day of the stabbing. The first call
was a message left on the manager's answering machine
at 7:20 or 7:25 a.m., which call she returned soon
after 7:30 a.m. Charlotte told her Eduardo had molested
her daughter. The second call was at 11:30 a.m. The
manager told Charlotte there was nothing she could do
about Eduardo.

Officer Briggs testified that he responded to the
Gutierrez's apartment at 7:09 a.m. and spoke with both
Charlotte and her daughter. He recounted his
conversation with Eduardo and his contact with child
protective services. He told Charlotte that Eduardo
denied the molestation and had become upset. When
Charlotte asked him if her daughter needed medical
attention, he responded that if she was concerned about
her daughter, it would be up to her to take her
daughter to a medical facility. Officer Briggs had
"very little conversation" with Edward and noted Edward
was quiet and upset. Officer Briggs told Charlotte and
Edward he was not going to do anything that morning.

A child protective services social worker confirmed
that she spoke with Officer Briggs at 9:10 a.m. on the
morning of the stabbing and that she told him her
department did not handle non-familial molests. Other
witnesses were called to impeach the testimony of the
People's civilian witnesses.

*Rebuttal*

Philip S. Trompetter, Ph.D., a clinical psychologist
who came to the jail to evaluate Edward the day after
the stabbing on behalf of the district attorney's
office, testified that he spoke with Edward for
approximately 40 minutes. While he did not evaluate
Edward because Edward did not consent to an evaluation,
he did not see any evidence of a major mental disorder,
although Edward's mood was depressed.

A police officer who interviewed Edward the afternoon
of the stabbing testified about that interview. After
Edward waived his Miranda rights, he admitted stabbing
Eduardo with a "marine military knife." Edward told the
officer he used the knife he purchased at the sporting
goods store, instead of a knife he already had, because
he "didn't trust them kitchen knives" since they didn't
have the blood groove that the purchased knife had,
explaining "[t]hey don't have a blood sheath in 'em. If
I stick him with that, it might stay in there. I wasn't
taking no chances. I was in the military before, so it
mattered to me." Edward also stated: "I know he did it.
I know he did it. I don't care about evidence and all
that. I know he did this from the way she was acting

and talking and having nightmares."

People v. Gutierrez, 2009 WL 765680 at *1-*8.

    IV.   Standard of Decision and Scope of Review

    Title 28 U.S.C. § 2254 provides in pertinent part:

> (d) An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claim that was adjudicated
> on the merits in State court proceedings unless
> the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding.

    Clearly established federal law refers to the holdings, as

opposed to the dicta, of the decisions of the Supreme Court as of

the time of the relevant state court decision.  Cullen v.

Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.

Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S.

362, 412 (2000).  It is thus the governing legal principle or

principles set forth by the Supreme Court at the pertinent time.

Lockyer v. Andrade, 538 U.S. 71-72.

    A state court's decision contravenes clearly established

Supreme Court precedent if it reaches a legal conclusion opposite

to, or substantially different from, the Supreme Court's or

concludes differently on a materially indistinguishable set of

facts.  Williams v. Taylor, 529 U.S. at 405-06.  The state court

need not have cited Supreme Court precedent or have been aware of

it, "so long as neither the reasoning nor the result of the

state-court decision contradicts [it]." Early v. Packer, 537
U.S. 3, 8 (2002).  A state court unreasonably applies clearly
established federal law if it either 1) correctly identifies the
governing rule but then applies it to a new set of facts in an
objectively unreasonable manner, or 2) extends or fails to extend
a clearly established legal principle to a new context in an
objectively unreasonable manner.  Hernandez v. Small, 282 F.3d
1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.  An
application of clearly established federal law is unreasonable
only if it is objectively unreasonable; an incorrect or
inaccurate application is not necessarily unreasonable.
Williams, 529 U.S. at 410.

A state court's determination that a claim lacks merit
precludes federal habeas relief as long as fairminded jurists
could disagree on the correctness of the state court's decision.
Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011).
Even a strong case for relief does not render the state court's
conclusions unreasonable.  Id.  To obtain federal habeas relief,
a state prisoner must show that the state court's ruling on a
claim was "so lacking in justification that there was an error
well understood and comprehended in existing law beyond any
possibility for fairminded disagreement." Id. at 786-87.  The
§ 2254(d) standards are "highly deferential standard[s] for
evaluating state-court rulings" which require that state court
decisions be given the benefit of the doubt, and the Petitioner
bear the burden of proof. Cullen v. Pinholster, 131 S. Ct. at
1398.  Further, habeas relief is not appropriate unless each
ground supporting the state court decision is examined and found

15

1  to be unreasonable under the AEDPA.  Wetzel v. Lambert, --U.S.--,

2  132 S.Ct. 1195, 1199 (2012).

3      In assessing under section 2254(d)(1) whether the state

4  court's legal conclusion was contrary to or an unreasonable

5  application of federal law, "review... is limited to the record

6  that was before the state court that adjudicated the

7  claim on the merits." Cullen v. Pinholster, 131 S. Ct. at 1398.

8  Evidence introduced in federal court has no bearing on review

9  pursuant to § 2254(d)(1). Id. at 1400.  Further, 28 U.S.C.

10 § 2254(e)(1) provides that in a habeas proceeding brought by a

11 person in custody pursuant to a judgment of a state court, a

12 determination of a factual issue made by a state court shall be

13 presumed to be correct; the petitioner has the burden of

14 producing clear and convincing evidence to rebut the presumption

15 of correctness.  A state court decision that was on the merits

16 and was based on a factual determination will not be overturned

17 on factual grounds unless it was objectively unreasonable in

18 light of the evidence presented in the state proceedings.

19 Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

20     The last reasoned decision must be identified in order to

21 analyze the state court decision pursuant to 28 U.S.C.

22 § 2254(d)(1).  Barker v. Fleming, 423 F.3d 1085, 1092 n.3 (9th

23 Cir. 2005); Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir.

24 2003).  Here, the CCA's decision was the last reasoned decision

25 in which the state court adjudicated Petitioner's claims on the

26 merits.  Where there has been one reasoned state judgment

27 rejecting a federal claim, later unexplained orders upholding

28 that judgment or rejecting the same claim are presumed to rest

16

upon the same ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803

(1991).  This Court will thus "look through" the summary decision

of the CSC denying review to the CCA's last reasoned decision as

the relevant state-court determination.  Id. at 803-04; Taylor v.

Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

    V.  Peremptory Challenge to Prospective Juror Mr. L

    During jury selection, Petitioner's counsel made a motion

pursuant to Batson v. Kentucky, 476 U.S. 79 (1986) concerning the

prosecutor's allegedly discriminatory exercise of peremptory

challenges against potential jurors on the basis of their Latino

appearance.  (Reporter's Supplemental Transcript (RST) 113-14.)[3]

Petitioner argues that the state court's decision upholding the

denial of Petitioner's Batson motion violated his right to an

impartial jury and equal protection of the laws guaranteed under

the Sixth and Fourteenth Amendments.  Petitioner contends that

the circumstances warranted a reasonable inference that the

prosecutor exercised a peremptory challenge of prospective juror

Mr. L because of his race, and thus Petitioner presented a prima

facie case of discrimination.  The prosecutor failed to present a

race-neutral reason for the challenge.  Thus, the state court

decision upholding the denial of Petitioner's Batson motion was

contrary to, or involved an unreasonable application of, clearly

---

[3] Although trial counsel mentioned several potential jurors (Ms. D, Mr. A, Mr. N, Mr. T, and Mr. L. [RST 113-14]), on appeal Petitioner raised only the exercise of a peremptory challenge as to Mr. L.  People v. Gutierrez, 2009 WL 765680 at *9).  Likewise, in the petition for review filed by Petitioner in the CSC, Petitioner's claim of error was limited to the trial court's ruling with respect to prospective juror Mr. L. (LD 12 at 3.)  This Court will thus limit its consideration of the claim presented to the state courts, namely, the ruling on the motion with respect to prospective juror Mr. L.  The circumstances of the other potential jurors will remain subject to the Court's consideration to the extent that they are relevant to the decision concerning Mr. L.

established federal law or was based on an unreasonable

determination of the facts in light of the evidence presented in

the state court proceedings within the meaning of 28 U.S.C.

§ 2254(d).  Petitioner seeks reversal of his conviction.

A.  <u>The State Court Decision</u>

The pertinent portion of the decision of the CCA follows:

I. *Denial of Batson-Wheeler Motion*

Edward, joined by Charlotte, contends the trial court
erred by not finding a prima facie case of
discrimination in the prosecutor's use of peremptory
challenges against Hispanic prospective jurors. When
Edward's trial counsel raised the motion below, he
claimed the prosecutor had excused four Hispanic
prospective jurors. On appeal, Edward limits his
argument to the excusal of a single Hispanic
prospective juror, Mr. L. We agree with the trial court
that Edward failed to raise an inference of
discrimination.

A. *Legal Principles*

"The purpose of peremptory challenges is to allow a
party to exclude prospective jurors who the party
believes may be consciously or unconsciously biased
against him or her." *(People v. Jackson* (1992) 10
Cal.App.4th 13, 17-18.) Peremptory challenges may
properly be used to remove jurors believed to entertain
specific bias, i.e., bias regarding the particular case
on trial or the parties or witnesses thereto. (*Wheeler,
supra*, 22 Cal.3d at p. 274.) However, "'[a]
prosecutor's use of peremptory challenges to strike
prospective jurors on the basis of group bias-that is,
bias against "members of an identifiable group
distinguished on racial, religious, ethnic, or similar
grounds"-violates the right of a criminal defendant to
trial by a jury drawn from a representative
cross-section of the community under article I, section
16 of the California Constitution. [Citations.] Such a
practice also violates the defendant's right to equal
protection under the Fourteenth Amendment to the United
States Constitution.'" (*People v. Bell* (2007) 40
Cal.4th 582, 596 (*Bell*); see *Batson, supra*, 476 U.S. at
pp. 88-89; *Wheeler, supra*, 22 Cal.3d at pp. 276-277.)

"There is a rebuttable presumption that a peremptory
challenge is being exercised properly, and the burden
is on the opposing party to demonstrate impermissible
discrimination." (*People v. Bonilla* (2007) 41 Cal.4th

18

313, 341.) The defendant must first "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson, supra*, 545 U.S. at p. 168, fn. omitted (*Johnson*).) This three-part structure of proof applies to both federal and state constitutional claims. *(Bell, supra*, 40 Cal.4th at p. 596; *People v. Avila* (2006) 38 Cal.4th 491, 541; *Wheeler, supra*, 22 Cal.3d at pp. 280-282.)

With these principles in mind, we turn to the motion in this case.

B. *Trial Proceedings*

At the outset of jury selection, 18 randomly-selected prospective jurors, including four with apparent Hispanic surnames, Mr. A, Mr. B, Mr. C and Ms. D, were seated in the jury box. Mr. A, who was 24 years old and had a high school education, requested and was granted an in-chambers conference in which he asserted his lack of education and life experience should excuse him from jury duty. The court, however, refused to excuse him. Later during voir dire, Mr. A said his brother was molested as a child, which caused him not to "like child molesters." Mr. A lived in Modesto, was currently unemployed but had worked in carpentry and masonry, lived with his mother, and had no children.

Mr. B's son worked for the sheriff's department at the county jail, but he denied that would affect him one way or another, although he was concerned the situation might affect the attorneys. Mr. B lived in Ceres, worked in a warehouse, had a wife who did not work outside the home, and in addition to his son, he had two other children in high school.

Mr. C lived in Patterson, worked as an equipment operator for an irrigation company, had a wife who was retired but had worked as a secretary for an insurance company, and had two children, both of whom worked for stores. Mr. C had served on a jury that was able to reach a verdict "five or six years ago" in a case involving a fight between a husband and an "ex-husband." He knew a person with the same name as a potential witness in the case.

Ms. D revealed her daughter had been charged with
assault, which might cause a problem because she knew
her daughter was innocent and she did not think she
could be fair to both sides of the case. Ms. D lived in
Modesto, was a high school attendance clerk, lived with
her husband, a hospital maintenance engineer, and had
two grown children, one a cook and the other a
housewife.

In response to voir dire by Edward's counsel, Ms. D
stated she had suffered from depression and thoughts of
suicide. Ms. D. explained her daughter had been charged
with assault as an accomplice and as a minor, and had
been found guilty, but she did not believe the system
treated her daughter fairly or that the defense did its
job in the case, although she would not hold that
against the defense in the present case. Mr. A opined
that "everybody probably has" been "enraged by any sort
of action to the point at which they confronted someone
or did something." Mr. A said his brother had been
molested "[w]hen he was very young," that he still felt
anger toward the molester, and he had confronted that
person, had thoughts of hurting that person, and had
actually "punched" the person "in his face." Mr. B
elaborated that his son worked in the jail "booking
department" but had never discussed the inmates with
him; Mr. B had no opinion on the guilt of people housed
in the jail but had known people who had been
incarcerated there.

After the parties passed the first group of prospective
jurors in the box for cause, the prosecutor used her
first peremptory challenge to remove a prospective
juror who did not have a Hispanic surname. She used her
second peremptory challenge to remove Ms. D. After the
two defense attorneys used a joint peremptory challenge
to remove Mr. B, the prosecutor used her third
peremptory challenge to remove another prospective
juror who did not have a Hispanic surname. She used her
fourth peremptory challenge to remove Mr. A.

Two prospective jurors with apparent Hispanic surnames,
Mr. N and Mr. R, were among those who replaced those
who had been removed. Mr. R was removed for cause by
stipulation after revealing two friends and a cousin
had been murdered and he did not feel he could be fair
and impartial. Mr. N lived in Patterson, worked as a
carpet installer, and lived with his parents and three
brothers. His mother owned a flower shop and his father
was also a carpet installer.

Another prospective juror with a possible Hispanic
surname, Mr. L, replaced a removed prospective juror in
the box. Mr. L answered "No" when asked if there was
anything about the questions and answers he had heard

20

so far that he needed to bring to the court's or parties' attention. Mr. L lived in Modesto, worked as an accountant, and lived with his wife, who was a homemaker, and their nine-year-old daughter.

At this point, jury selection was adjourned for the evening. Out of the presence of the prospective jurors, the court stated there had a been a sidebar about the prosecutor's challenges for cause to Mr. A and Ms. D, which the court had denied. The court gave the prosecutor and defense attorneys the opportunity to place on the record anything about the denial of the challenges.

During jury selection the next day, in response to voir dire by Edward's counsel, Mr. L stated that his sister claimed she was molested by his grandfather, but she did not raise the claim until after his death, so it was never resolved or investigated. Mr. L did not know about the molestation before his grandfather's death.

During the next round of peremptory challenges, the prosecutor used her fifth challenge to remove a prospective juror who did not have an apparent Hispanic surname, Mr. T. She used her sixth challenge to remove Mr. N. After the defense used a joint challenge to remove Mr. C, the prosecutor used her seventh challenge to remove Mr. L. Edward's counsel requested a sidebar, and the court called a recess.

Outside the jury's presence, Edward's counsel made a *Wheeler/Batson* motion, asserting the prosecutor was using her peremptory challenges to exclude prospective jurors on the basis of race, namely being either Latino or of Latin descent or appearance. Edward's counsel specifically identified five jurors out of the seven the prosecutor had excused who he believed to be Hispanic or Latino: Mr. L, Ms. D, Mr. A, Mr. T, and Mr. N. The court responded that it did not appear to the court that Mr. T was Latino, but the other four had Latino names.

The prosecutor immediately explained with respect to Mr. A that while she did not exercise a challenge to him "right off the bat, ... it was clear that, not only did he not want to sit, but he said that, in fact, that his brother had been molested, that he confronted the brother who had been molested [sic]; and for that reason and that reason alone, of course, including the fact that he didn't want to be a juror, even had in chambers, as I recall, he said he had a lack of education. It was at least clear to me that he didn't want to be here. When I learned that his brother had also been molested, that was the grounds."

The court then asked about Ms. D. The proscutor
responded that she needed to know what seat Ms. D was
in, since that was how she kept her chart. When told
Ms. D. was in seat number one, the prosecutor explained
that because the defense was "going to raise
depression, she had made comments about her depression.
She also said that her daughter was-had an assault
trial, she knew her daughter was innocent. From the
People's perspective, she just believed her daughter.
[¶] ... [¶] ... she also said knowing and believing
that her daughter was innocent, certainly believed that
she could hold that against the prosecution. There were
concerns and she expressed, concerns over her
depression, since I knew that would be a defense in
this particular case."

With respect to Mr. N, the prosecutor explained that he
was a carpenter and "[h]e had a lot of body language.
He didn't look at me. His head was swinging. He was
doing-what do I call this? Wrist wringing, seemed
extremely nervous, kept doing this, his body language
kept doing like-" The court stated, "Crossing legs."
The prosecutor continued, "Crossing legs, but what I'm
trying to get at was a nervous knee. I did not believe
that the Court kept his full attention while the Court
was addressing him."

Finally, with respect to Mr. L, the following ensued:

"THE COURT: ... How about Mr. L[ ], the CPA gentleman?
He was in seat number 12-seat number 18, and then he
got moved up to seat number 6, I believe it was.

"[PROSECUTOR]: Okay. He's the accountant and he had
police officer ties. Quite honestly, Your Honor. I did
not think he was Hispanic. I mean, I didn't. I didn't
think he [ ] was Hispanic at all.

"THE COURT: Okay.

"[PROSECUTOR]: And if the Court-I see still see,
although we haven't gotten there for the record, Mr. V[
]'s still on the panel and there's other people that
have not yet-Mr. P[ ] is not up there yet, but there
are several other people.

THE COURT: All right. You want to comment?

[EDWARD'S COUNSEL]: Your Honor, I feel that [the
proecutor's] comments are pretexted [ sic ] and I think
that's most evident in N[ ] and L[ ]. There's no real
artiulable reason other than a nervous twitch and that
carries over with N[ ]. From what my notes were,
is there's no real reason why the prosecutor should
have gotten rid of him and the only one I can think

of in the group based upon the group that I've seen her peremptorily challenge. This is all a pretext for eliminating them because they are Hispanic or Latino."

After Charlotte's counsel declined the court's invitation to comment, the court denied the motion, explaining: "Well, there's certainly nothing with Mr. A[ ] insofar as what he's done, anything about that. Obviously either one of the three of you were going to kick Mr. A[ ] off. I was pretty confident on that. He came pretty close to trying to get the Court to excuse him. I wouldn't. [¶] Ms. D[ ] about the answers with her daughter ... certainly doesn't show any kind of ethnicity. [¶] Mr. N[ ] and Mr. L[ ] both appear to be Hispanic. Mr. L[ ] appeared to be to me. [¶] I don't see she's doing it any type of pretextual to try to keep Hispanic people off of the jury. There's no basis for that. [¶] I asked if anybody wanted me to voir dire on ... ethnicity. They told me ... they didn't want me to voir dire on ethnicity. So I didn't do it. It hasn't reached the point of Batson-Wheeler type matter. [¶] Ms. [prosecutor], I will admonish you that if you continue to do this, I suspect counsel is going to ask us to revisit the issue."

Jury selection then continued, with the prosecutor excusing two jurors with non-Hispanic names and then accepting the jury as constituted five times before the defense finally accepted it. Although the record does not reveal the surname, race or ethnicity of anyone who served on the jury or as alternates, it appears that at least two jurors spoke Spanish and therefore may have been Hispanic.

C. *Analysis*

Edward contends the trial court erred by failing to find a prima facie showing of discrimination with respect to the prosecutor's peremptory strike of Mr. L. "In order to make a prima facie showing, 'a litigant must raise the issue in a timely fashion, make as complete a record as feasible, [and] establish that the persons excluded are members of a cognizable class.' [FN5] [Citation.] The high court [has] explained that 'a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] 'An "inference" is generally understood to be a "conclusion reached by considering other facts and deducing a logical consequence from them." '" (*People v. Gray* (2005) 37 Cal.4th 168, 186; *Johnson, supra*, 545 U.S. at pp. 168-170 & fn. 4.)

> FN5. Hispanics are a cognizable group for purposes *of Batson-Wheeler* analysis. (*People*

*v. Trevino* (1985) 39 Cal.3d 667, 686,
disapproved on other grounds in *People v.
Johnson* (1989) 47 Cal.3d 1194, 1221.)

"The three-step *Batson* analysis, however, is not so mechanistic that the trial court must proceed through each discrete step in ritual fashion. Thus, the trial court may invite the prosecutor to state race-neutral reasons for the challenged strikes before announcing its finding on whether a defendant met the first step of the Batson test by making out a prima facie case of discrimination." (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 500-501 (*Adanandus*).) Indeed, "it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out. This may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established." (*Bonilla, supra,* 41 Cal.4th at p. 343, fn. 13; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 723-724 [even where no prima facie case found, court may properly consider reasons actually given by the prosecutor].)

"[W]here the ' " 'trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with "considerable deference" on appeal. [Citations.] If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'" ' " (*Adanandus, supra,* 157 Cal.App.4th at p. 501; *Bonilla, supra,* 41 Cal.4th at p. 341 ["we review the trial court's denial of a *Wheeler/Batson* motion deferentially, considering only whether substantial evidence supports its conclusions"].)

As a preliminary matter, Edward asserts that because the trial court did not specifically state the standard it used to determine whether he established a prima facie case of discrimination and instead stated that the issue hadn't "reached the point of *Batson-Wheeler* type matter" and told the prosecutor not to "continue to do this," the trial court may have applied an incorrect standard, i.e. that he was required "to make a prima facie showing of 'systematic discrimination' based on race or ethnicity," instead of raising only a reasonable inference of discrimination. Accordingly,

Edward asks us to independently determine whether he established a prima facie case of discrimination by using the reasonable inference test under *Batson*. We do not read the trial court's comments, however, as suggesting it wrongly believed more than one excusal was required before a prima facie case could be established; instead, it appears the trial court found the prosecution's excusal of the four jurors at issue did not establish a prima facie case on the facts before it. Assuming the trial court erred in this regard, however, "'we have reviewed the record and, like the United States Supreme Court decision in *Johnson*... [we] are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race.'" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1101.)

We find no such inference here. Edward correctly concedes the prosecutor's excusal of Mr. A, Ms. D and Mr. N did not raise an inference of discrimination, as there were ample reasons to excuse these jurors based on factors other than their race, i.e. Mr. A's unwillingness to serve, Ms. D's attitude toward the proceedings in light of her daughter's experience, and Mr. N's inability to pay attention. Instead, Edward focuses on the peremptory challenge of Mr. L, arguing his excusal alone was enough to raise an inference of discrimination. We conclude the record as a whole fails to support a reasonable inference that the prosecutor's peremptory challenges reflected the discriminatory purpose of eliminating Hispanics from the jury.

In making this assessment, we must evaluate the totality of the relevant circumstances surrounding the use of the peremptory challenge against Mr. L. (See *Johnson, supra*, 545 U.S. at p. 168.) Although the establishment of a prima facie case does not depend on the number of prospective jurors challenged (see *People v. Moss* (1986) 188 Cal.App.3d 268, 277), since "[t]he exclusion by peremptory challenge of a single juror *on the basis of race or ethnicity* is an error of constitutional magnitude" (*People v. Silva* (2001) 25 Cal.4th 345, 386, italics added), the requisite showing is not made merely by establishing the excused prospective juror was a member of a cognizable group (*People v. Alvarez* (1996) 14 Cal.4th 155, 198 *(Alvarez)*; *United States v. Chinchilla* (9th Cir.1989) 874 F.2d 695, 698; see *People v. Hoyos* (2007) 41 Cal.4th 872, 901).

There was an obvious permissible strategic factor that could have motivated the prosecutor to utilize a peremptory strike on Mr. L, as he admitted during voir dire that his sister had claimed his grandfather

molested her. In a trial where an allegation of molestation was at issue, certainly the prosecutor could have decided that jurors who in any way had experience with molestation would be biased. The prosecutor had removed other jurors who had stated either they or a family member had been molested, including Mr. A and another juror with a non-Hispanic surname. Because Mr. L's sister had claimed to be molested, Mr. L was not heterogeneous with the other jurors who remained on the panel, as Edward claims.

Edward asserts an inference of discrimination is shown by the prosecutor's excusing Mr. L after excusing three other Hispanic prospective jurors without questioning him. As we have mentioned, however, the prosecutor had ample reasons for excusing the other Hispanic jurors. Moreover, the prosecutor also excused three other prospective jurors who had non-Hispanic names before excusing Mr. L. Thus, she was not using her peremptory challenges solely on Hispanics. While the prosecutor did not individually question Mr. L, she only individually questioned two jurors who were in the original panel of 18-one was a prospective juror with a non-Hispanic name who she exercised her third peremptory challenge on, and the other was Mr. C., on whom the defense exercised a peremptory challenge. The prosecutor did not individually question any of the prospective jurors who replaced those who had been removed. Accordingly, no inference of discrimination may be drawn from the prosecutor's failure to question Mr. L.

Edward contends an inference of discrimination may be drawn from the prosecutor's failure to adequately explain why she struck Mr. L. Edward asserts that because the trial court stated that Mr. L appeared to be Hispanic, the prosecutor's statement that she honestly did not think he was Hispanic is not supported by the record and therefore does not provide a race-neutral explanation for the challenge. It is not apparent from the record, however, that the trial court found the prosecutor's belief in Mr. L's ethnicity to be unreasonable. The prosecutor stated that she did not think Mr. L was Hispanic, while the trial court stated that he appeared to the court to be Hispanic. Significantly, the trial court did not state that Mr. L was so obviously Hispanic looking that the prosecutor reasonably could not have believed that he was not Hispanic or that her statement was otherwise a sham excuse.

Since we are confronted solely with a paper record of the voir dire proceedings, we are ill suited to determine whether the prosecutor's reason for striking Mr. L. was genuine (if mistaken), but must generally

"'rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.'" (*People v. Williams* (1997) 16 Cal.4th 153, 189 [recognizing that "a genuine 'mistake' is a race-neutral reason" and emphasizing that the appellate courts must "'rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination'"]; *Avila, supra*, 38 Cal.4th at p. 541 ["It is presumed that the prosecutor uses peremptory challenges in a constitutional manner, and we give deference to the court's ability to distinguish 'bona fide reasons from sham excuses'"].)

Further, the evaluation of the prosecutor's reasons for strikes is not the applicable inquiry where, as here, the trial court found no prima facie case of discrimination. (*People v. Farnam* (2002) 28 Cal.4th 107, 138 ["In light of our conclusion that the trial court properly found no prima facie case of racial bias, we need not review the prosecutor's justifications for her peremptory challenges or the trial court's weighing of those justifications"].) Rather, we are concerned solely with whether the record supports an inference the prosecutor excused Mr. L because of his race. (*Ibid.*) With respect to this question, the prosecutor's stated belief that Mr. L did not appear to be Hispanic does not alter the fact that the totality of the circumstances does not support an inference of discrimination.

Thus, this case is distinguishable from *Snyder v. Louisiana* (2008) 552 U.S. 472 [128 S.Ct. 1203] (*Snyder*), wherein the United States Supreme Court described the reasons given by the prosecutor for excusing a prospective juror as "unconvincing," "highly speculative," "suspicious," "implausib[le]" and "pretextual," which created an inference of discriminatory intent. (*Id.* at pp. 1203 [128 S.Ct. at pp. 1208-1212].) Unlike *Snyder*, there is no basis in the record here for a finding the prosecutor's reasons were pretextual. In any event, the trial court here found the defense failed to establish a prima facie case of discrimination.

Edward contends that we should not engage in speculation about the prosecutor's unstated reasons for striking Mr. L, citing *Johnson*, in which the United States Supreme Court stated: "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory

purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson, supra*, 545 U.S. at p. 172.) However, "[t]he quoted caution against speculation must be read in light of the high court's statement that a prima facie case is established when the 'defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] Once the trial court concludes that the defendant has produced evidence raising an inference of discrimination, the court should not speculate as to the prosecutor's reasons-it should inquire of the prosecutor, as the high court directed. But there is still a first step to be taken by the defendant, namely producing evidence from which the trial court may infer 'that discrimination has occurred.' [Citation .] We have concluded that the evidence alluded to by defendant in the trial court did not support such an inference, nor was such an inference supported by the challenged juror's own statements or anything else in '"the totality of the relevant facts"' [citation] that we have seen in our examination of the record...." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73-74, disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).)

Edward places much reliance on the court's "admonition" to the prosecutor "against continuing 'to do this'" as further evidence of the prosecutor's discriminatory purpose in removing Mr. L. Reading the court's statement in context, however, it does not appear to us that the court was suggesting the prosecutor had a discriminatory purpose in removing Mr. L, but was only warning the prosecutor that the defense would continue to scrutinize her use of peremptory challenges and ask the court to "revisit the issue," i.e. make another *Batson-Wheeler* motion, if it perceived such a motion had merit.

In sum, we find nothing in the record to support an inference that the prosecutor discriminated against Mr. L because of his race.

People v. Gutierrez, 2009 WL 765680 at *9-*16.

     B.   Legal Standards

     Although a prosecutor ordinarily is entitled to exercise peremptory challenges for any reason related to her view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor from challenging

potential jurors solely on account of their race or on the
assumption that  jurors of a racial group will be unable
impartially to consider the State's case against a defendant from
that racial group.  Batson v. Kentucky, 476 U.S. at 89.  A
defendant can make out a prima facie case of discriminatory jury
selection by the totality of the relevant facts about a
prosecutor's conduct during the defendant's own trial.  Id. at
94, 96.  Once the defendant makes a prima facie showing, the
burden shifts to the state to come forward with a neutral
explanation for challenging jurors within an arguably targeted
class.  Id. at 97.  A prosecutor must give a clear and reasonably
specific explanation of the legitimate reasons for exercising the
challenge or challenges.  Id. at 98.  The trial court then has
the duty to determine if the defendant has established purposeful
discrimination.  Id.  The ultimate burden of persuasion regarding
racial motivation rests with, and never shifts from, the opponent
of the strike.  Purkett v. Elem, 514 U.S. 765, 768 (1995).

Under Batson's first step, the defendant must establish a
prima facie case of purposeful discrimination.  Batson, 476 U.S.
at 93-94.  He must show that 1) the prospective juror is a member
of a cognizable racial group, 2) the prosecutor used a peremptory
strike to remove the juror and 3) the totality of the
circumstances raises an inference that the strike was on account
of race.  Id. at 96; Crittenden v. Ayers, 624 F.3d 943, 955 (9th
Cir. 2010).  A defendant satisfies the requirements of Batson's
first step by producing evidence sufficient to permit the trial
judge to draw an inference that discrimination has occurred.
Johnson v. California, 545 U.S. 162, 170 (2005).  Unless the

court finds a prima facie showing of discrimination, <u>Batson</u> does not require the party exercising the peremptory challenge to provide race- or gender-neutral reasons. <u>J.E.B. v. Alabama</u>, 511 U.S. 127, 144-45 (1994); <u>Batson</u>, 476 U.S. at 97.

With respect to the prima facie inquiry, the determination made by the trial court involves a mixed question of law and fact because the court must determine whether the facts, which are established because they customarily have all occurred in the presence of the trial court in the courtroom, are sufficient to meet the requirements of the legal rule concerning a prima facie case. <u>Tolbert v. Page</u>, 182 F.3d 677, 681 n.6 (9th Cir. 1999) (en banc).

Credibility findings a trial court makes in a <u>Batson</u> inquiry are reviewed in a federal habeas proceeding under 28 U.S.C. § 2254(d)(2). <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006) (declining to decide whether § 2254(e)(1) also applied). Further, a state trial court's ruling on whether a criminal defendant has established a prima facie case of prosecutorial discrimination in the exercise of a peremptory challenge is reviewed with deference and will be afforded the statutory presumption of correctness. <u>Tolbert v. Gomez</u>, 190 F.3d 985, 988-89 (9th Cir. 1999) (regarding the pre-AEDPA version of 28 U.S.C. § 2254(d) (1995) ("[A] determination after a hearing on the merits of a factual issue, made by a state court... evidenced by a written finding... shall be presumed to be correct.")); <u>Tolbert v. Page</u>, 182 F.3d at 682. The determination is fact-dominated, and it often involves the credibility and demeanor of the attorney who exercised the challenge as well as the demeanor or

1  behavior of jurors, matters which lie peculiarly within a trial

2  judge's province.  Tolbert, 182 F.3d at 681-85, 682 (citing

3  Batson, 476 U.S. at 95); see, Hernandez v. New York, 500 U.S.

4  352, 365 (1991) (plurality opinion); Snyder v. Louisiana, 552

5  U.S. 472, 477 (2008).

6      Further, where review of a state court's factual finding of

7  the presence or absence of discriminatory animus is based

8  entirely on information contained in the state court record,

9  § 2254(d)(2) is the governing statute; where review involves

10 extrinsic evidence, § 2254(e)(1) governs review.  Ali v. Hickman,

11 584 F.3d 1174, 1181 & n.4 (9th Cir. 2009) (citing Kesser v.

12 Cambra, 465 F.3d 351, 358 & n.1 (9th Cir. 2006) and Taylor v.

13 Maddox, 366 F.3d 992 (9th Cir. 2004)); but see, Miller-El v.

14 Dretke, 545 U.S. 231, 240 (2005) (failing to distinguish between

15 the two statutes).  Here, where the Court's review is limited to

16 the state court record, § 2254(d)(2) should govern the analysis.

17     Pursuant to § 2254(d)(2), a habeas petition may be granted

18 only if the state court's conclusion was an unreasonable

19 determination of the facts in light of the evidence presented in

20 the state court proceeding.  For relief to be granted, a federal

21 habeas court must find that the trial court's factual

22 determination was unreasonable such that a reasonable fact finder

23 could not have made the finding; that reasonable minds might

24 disagree with the determination or have a basis to question the

25 finding is not sufficient.  Rice, 546 U.S. at 340-42.  As with

26 the determination made under § 2254(d)(1), the state court's

27 determination must be not merely incorrect or erroneous, but

28 rather objectively unreasonable.  Taylor v. Maddox, 366 F.3d 992,

1  999 (9th Cir. 2004).  To conclude that a state court finding is

2  unsupported by substantial evidence, the federal habeas court

3  must be convinced that an appellate panel, applying the normal

4  standards of appellate review, could not reasonably conclude that

5  the finding is supported by the record.  Id. at 1000.

6          C.  Analysis

7       Here, the CCA articulated the correct, clearly established

8  federal legal standards as set forth in Batson and its progeny.

9  The decision referred to clearly established federal law.

10  Further, the CCA applied that law in a manner that was consistent

11  with the law and objectively reasonable in light of the facts and

12  factual findings.

13       With respect to factual findings, the CCA reasonably

14  concluded that the trial court had determined that a prima facie

15  case had not been made when the court stated that it had not

16  "reached the point of Batson-Wheeler type matter."  (RST 117.)

17  The trial court had not solicited the prosecutor's explanations;

18  rather, the transcript shows that the prosecutor spontaneously

19  offered her description of the challenges and jurors immediately

20  after defense counsel made the motion and identified five jurors

21  as allegedly having been challenged on the basis of race.  (Id.

22  at 114.)  The trial court then proceeded through the specified

23  names, helping the prosecutor to connect the names listed by

24  defense counsel with the individual prospective jurors, whom the

25  prosecutor had apparently tracked by seating location.  (Id. at

26  114-17.)  Further, the data the prosecutor communicated to the

27  trial court included her impression that Mr. L was not Hispanic,

28  the history of in camera proceedings involving the prospective

                                32

jurors, and information concerning other prospective jurors who remained and who might have been Hispanic.  (Id. at 116.) Considering the number of jurors involved and the information communicated, the colloquy appears to have oriented the trial court and the parties and to have marshaled the facts concerning the affected prospective jurors to enable a prima facie determination to be made.  The trial court reviewed the circumstances and noted that there was no basis for concluding that the prosecutor's actions were to keep Hispanic people off the jury.  (Id. at 117.)  The transcript also supports an inference that the trial court considered the pertinent responses of the prospective jurors, the nature of the charges and the defenses anticipated to be raised, the presence of weighty reasons for challenging the panel members that were independent of ethnicity and of a sort that had precipitated challenges to non-Hispanic jurors, the prosecutor's challenges to four or five jurors who did not appear to be Hispanic, and the fact that all parties declined the court's request to voir dire on ethnicity in the context of the entire voir dire.  (Id. at 117.)  Although the prosecutor did not expressly list as a reason for striking Mr. L the unresolved claim of molestation by Mr. L's sister, the record appropriately considered by the trial court included that information.

    In addition to Mr. L, the prosecutor challenged two other prospective jurors who had been molested or had a close family member who had been molested.  The record supported an inference that the prosecutor believed that persons whose close relatives had experienced molestation or who had been molested themselves

33

would have been biased in favor of the defendants, who committed the criminal acts in response to information that the victim had molested their daughter.  The unwillingness of Mr. A to serve, Ms. D's depression and reaction to what she perceived as an unfair prosecution of her daughter, and Mr. N's level of distraction warranted a conclusion that these other apparently Hispanic jurors were challenged for substantial reasons unrelated to ethnicity but reasonably bearing upon the jurors' ability to attend to the evidence and render an impartial verdict.  In light of all the evidence presented, a reasonable fact finder could have made the finding and the trial court's determination was not objectively unreasonable or unsupported by substantial evidence.

In sum, the Court concludes that the state court decision affirming the trial court's finding of no prima facie case of discrimination was not contrary to, or an unreasonable application of, clearly established federal law, and it was not based on an unreasonable determination of facts in light of the evidence presented in the state court proceedings.  It will be recommended that Petitioner's claim concerning the peremptory challenge of Mr. L be denied.

VI.   Right to Present a Defense

Petitioner argues that the trial court's failure to permit Dr. Seymour to testify concerning special considerations in interviewing a toddler violated Petitioner's right to present a defense.

A.   The State Court Decision

The pertinent portion of the decision of the CCA is as follows:

34

II. Dr. Seymour's Testimony

Charlotte, joined by Edward, contends the trial court deprived her of her federal constitutional right to present a full or complete defense when it limited the scope of her cross-examination of Dr. Seymour and denied her request to call Dr. Seymour as her own witness. (U.S. Const., Amends. V, XIV.) We disagree.

A. Trial Proceedings

Dr. Seymour opined on direct examination that Edward's actions on the day in question were impulsive. When explaining his interview of Edward, Dr. Seymour mentioned he had reviewed a police report that stated an officer responded to the Gutierrezes' apartment on the morning of the charged crimes and based on the information the officer gathered, including talking to Eduardo, informed Edward "that there was not a way to proceed with this at this point" but he should contact child protective services and get their daughter checked medically. During cross-examination by the prosecutor, Dr. Seymour confirmed that he had read the following paragraph from Officer Briggs's police report: "I spoke to the victim about good touch, bad touch, which she understood. I asked her if she had ever been touched in a bad way. The victim told me she had not." He also confirmed he had read Officer Briggs's statement in his report that the daughter didn't give him any indication she had been touched inappropriately. Dr. Seymour also confirmed during the prosecutor's cross-examination that he did not interview anyone other than Edward.

During cross-examination by Charlotte's counsel, Dr. Seymour was asked: "In terms of [Edward's] belief that his daughter was molested, given what he told you, do you believe that belief was reasonable?" Dr. Seymour responded, "That she could have been?" Charlotte's counsel said, "Yes." Dr. Seymour answered: "It is a reasonable concern, if your child tells you that, that you would suspect that, that he would be concerned about that under the circumstances."

Dr. Seymour also testified on cross-examination by Charlotte's counsel that he had taught about a dozen courses in developmental and child psychology, and confirmed there were special difficulties when asking questions of a three-and-a-half year old. Dr. Seymour explained the difficulties: "One of the principal concerns is the extent to which a child of that age has the capacity to differentiate reality from fantasy. A second concern is language based. We use different language than children, and as a consequence, that's always a concern. The third concern is how is

35

information incorporated into memory. One of the things we know, for example, is by the time most of us get to age ten, we don't remember a lot that happened before age five. That's because much of what gets incorporated in our memory is not language based, which is how we're trying to pull it up now. [¶] So a lot of the information is emotional based. It's image based, sounds, pictures, that kind of thing more so than the language we would expect of an older child, adolescent or adult. Those are several of the main factors."

When Charlotte's counsel asked if Dr. Seymour ever had interviewed a three-and-a-half year old, he responded: "Yes, if you call it an interview. It's not the interview the way we would typically think about it, but I have evaluated children of that age." The following ensued:

"[CHARLOTTE'S COUNSEL]: All right. You say it's not the way we typically think of it.

"[DR. SEYMOUR]: Yes, that's correct.

"[CHARLOTTE'S COUNSEL]: What [ ] do you mean by that?

"[PROSECUTOR]: Objection. Relevancy.

"THE COURT: Sustained.

"[CHARLOTTE'S COUNSEL]: Well, Judge, I would like to-

"THE COURT: I've sustained the objection. Go ahead.

"[CHARLOTTE'S COUNSEL]: Can I call him as my own witness?

"THE COURT: No.

"[CHARLOTTE'S COUNSEL]: I intend to call him as my own witness. May I do it now?

"THE COURT: I sustained the objection. And you're not asking him on this issue. That means you move on to the next step. [¶] Proceed.

"[CHARLOTTE'S COUNSEL]: I don't have any further questions."

Dr. Seymour was ultimately excused "subject to recall" by Charlotte's counsel, but he never recalled him as a witness.

B. Analysis

Charlotte contends the trial court erred when it

sustained the prosecutor's relevancy objection and refused to allow her to call Dr. Seymour as her own witness on the issue of interviewing a three-year-old child. Charlotte asserts the testimony was relevant because the prosecutor, by her cross-examination of Dr. Seymour, was inviting the jury to conclude that his evaluation and opinion regarding Edward's mental state were defective due to the contents of Officer Briggs's report and Dr. Seymour's failure to interview her daughter. Charlotte reasons that without Dr. Seymour's testimony regarding "the intricacies of child victim interviews," her daughter's denial of molestation to Officer Briggs stood uncontested and true, therefore Dr. Seymour could not have opined that Edward reasonably relied on his daughter's statements as the root of his actions. Charlotte concludes the absence of testimony which would undermine Officer Briggs's interview of her daughter and her daughter's denial of molestation deprived her of a defense, or the opportunity to present a complete defense, i.e. that she and Edward could rely on their daughter's statements as the basis for their actions.

"'The state and federal Constitutions guarantee the defendant a meaningful opportunity to present a defense....'" (*People v. Woods* (2004) 120 Cal.App.4th 929, 936.) However, "[a]pplication of the ordinary rules of evidence... does not impermissibly infringe on a defendant's right to present a defense." (*People v.. Mincey* (1992) 2 Cal.4th 408, 440.) Even erroneous limitations placed on a defendant's right to present evidence generally do not constitute a deprivation of a defendant's constitutional right to present a defense: "'Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, "[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." '" (*People v. Boyette* (2002) 29 Cal.4th 381, 428 *(Boyette)*.)

The California Supreme Court has held: "'The trial court has broad discretion in determining the relevance of evidence....' " (*People v. Smithey* (1999) 20 Cal.4th 936, 973.) We examine the admissibility of the proffered evidence utilizing the deferential abuse of discretion standard of review. (*People v. Cox* (2003) 30 Cal.4th 916, 955, disapproved on another point by *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22 [Evid.Code, § 352]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9; *Alvarez, supra*, 14 Cal.4th at p. 201.)

In this case, the trial court reasonably could conclude that evidence regarding the problems involved in interviewing a three-year-old child was irrelevant to Dr. Seymour's opinion regarding Edward's mental state, as well as the issues in the case. The primary issues in the case were Edward's and Charlotte's mental states when the homicide occurred. Dr. Seymour testified Edward acted impulsively, i.e. he wanted to confront Eduardo about the alleged molestation and got out of control once he did so. He also testified it was reasonable, "if your child tells you" she was molested, to be concerned about and suspect molestation "under the circumstances." As the trial court and the parties noted during discussion of the prosecutor's pretrial in limine motion regarding limitations on evidence regarding the alleged molestation, the relevant issue was what information was relayed to the parents, not whether the molestation did or did not happen. Since Charlotte and Edward would not be aware of how an interview of a three-year-old should be conducted or whether Officer Briggs's interview was proper, the evidence of such is irrelevant to their states of mind. The evidence is also not relevant to Dr. Seymour's opinion, which was simply that if your child tells you she has been molested, it is reasonable to be concerned about that. Accordingly, no abuse of discretion occurred. *(People v. Rodriguez, supra*, 20 Cal.4th at p. 9; *People v. Quartermain* (1997) 16 Cal.4th 600, 626.)

In view of our conclusion that the trial court did not abuse its discretion in limiting the expert's testimony, it necessarily follows that the court did not violate Charlotte's or Edward's constitutional right to present a defense. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 685.) Even assuming, strictly for the sake of argument, that the court erred in excluding any of the evidence, such error did not deprive Charlotte or Edward of their constitutional right to present a defense. Dr. Seymour did testify that young children are difficult interview subjects. Moreover, Charlotte's counsel was able to question Officer Briggs about his lack of special training in interviewing young children or of having taken courses in child psychology, and Edward's counsel questioned him extensively about the scope of his interview of the daughter and his failure to ask her directly about "spiders." From this, Edward's counsel was able to argue to the jury that their daughter was not sophisticated enough to relay the details of the alleged molestation and Officer Briggs's interview was incomplete. In addition, Charlotte's counsel was able to argue that: while it was not for the jury to decide whether a molestation occurred, it was reasonable for Charlotte and Edward to believe their daughter had been molested because of what she said and the way she was

acting; and Officer Briggs should not have interviewed their daughter, and instead should have taken a report from Charlotte and Edward and referred their daughter to a detective who specialized in child molestation, since it takes great skill and training to interview a three-and-a-half year old. The trial court did not "completely exclud[e] evidence of [their] defense." *(Boyette, supra*, 29 Cal.4th at p. 428.)

People v. Gutierrez, 2009 WL 765680, *16-*19.

       B.  Legal Standards

Although state and federal authorities have broad latitude to establish rules excluding evidence from criminal trials, the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation clauses of the Sixth Amendment guarantee a criminal defendant a meaningful opportunity to present a complete defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986). It is a fundamental element of due process of law that a defendant has a right to present a defense by compelling the attendance and presenting the testimony of witnesses. Washington v. Texas, 388 U.S. 14, 18-19, 23 (1967). However, a defendant does not have an absolute right to present evidence without reference to its significance or source; rather, the right to present a complete defense is implicated when the evidence the defendant seeks to admit is relevant, material, and vital to the defense. Id. at 16. Further, the exclusion of the evidence must be arbitrary or disproportionate to the purposes the exclusionary rule is designed to serve. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006). If the mechanical application of a rule that is respected, frequently applied, and otherwise constitutional would defeat the ends of justice, then the rule must yield to those ends. Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

However, well established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Holmes v. South Carolina, 547 U.S. at 326. Thus, it is constitutionally permissible to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues. Holmes v. South Carolina, 547 U.S. at 326-27.

Where exclusion of evidence violates a petitioner's right to present a defense, habeas relief is the appropriate remedy only if the constitutional violation resulted in error that was not harmless, that is, error that resulted in actual prejudice, or had a substantial and injurious effect or influence in determining the jury's verdict. Jackson v. Nevada, - F.3d -, 2012 WL 3156377, *11 (No. 09-17239, 9th Cir. Aug. 6, 2012) (citing Fry v. Pliler, 551 U.S. 112, 121-22 (2007) and Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). To consider whether the Brecht standard has been met, a court considers various factors, including but not limited to 1) the importance of the witness's testimony in the prosecution's case, 2) whether the testimony was cumulative, 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, 4) the extent of cross-examination otherwise permitted; and 5) the overall strength of the prosecution's case. Merolillo v. Yates, 663 F.3d 444, 455 (9th Cir. 2011) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

///

1          C.   <u>Analysis</u>

2          As a preliminary matter, Respondent objects that Petitioner

3  lacks standing to raise this issue because it was Petitioner's

4  co-defendant, and not Petitioner, who attempted to introduce the

5  evidence.   Petitioner argues that his special relationship as a

6  co-defendant was sufficient to confer standing.

7          The jurisdiction of the Court is limited to cases and

8  controversies.   U.S. Const. art III, § 1.   For this Court to have

9  subject matter jurisdiction, a petitioner must have standing to

10 sue at the time the action is filed.   <u>Lujan v. Defenders of</u>

11 <u>Wildlife</u>, 504 U.S. 555, 569 n.4 (1992).   To meet the burden of

12 establishing standing, a litigant must show that 1) he personally

13 has suffered an actual or prospective injury as a result of the

14 putatively illegal conduct; 2) the injury can be fairly traced to

15 the challenged conduct; and 3) the injury is likely to be

16 redressed through court action.   <u>Lujan v. Defenders of Wildlife</u>,

17 504 U.S. 560-562; <u>Valley Forge Christian College v. Americans</u>

18 <u>United for Separation of Church and State, Inc.</u>, 454 U.S. 464,

19 472 (1982).   Plaintiff must have suffered an "injury in fact,"

20 i.e., an invasion of a legally protected interest which is a)

21 concrete and particularized, and b) actual or imminent, and not

22 conjectural or hypothetical.   <u>Id.</u>   There must be a causal

23 connection between the injury and the conduct complained of such

24 that the injury is not the result of the independent action of a

25 third party not before the Court.   <u>Id.</u>

26         Here, although the witness was Petitioner's witness, it was

27 the co-defendant's counsel who asked the pertinent questions that

28 elicited the relevance objection.   However, regardless of how

entitlement to claim an injury is conceptualized, it is undisputed that Dr. Seymour was excused without qualification by Petitioner's counsel at the end of the examination.  (4 RT 898-99.)  When Petitioner's co-defendant's counsel asked that the witness be excused subject to recall, the trial court admonished the witness that he could be recalled by means of a telephone call.  (Id.)  The trial court had not completely prohibited questioning the witness about interviewing children.  Rather, in sustaining the relevance objection to the question concerning interviewing young children, the trial court merely declined to permit the co-defendant to examine the witness in the course of cross-examination.  Neither party contends that the record shows that either Petitioner's counsel or his co-defendant's counsel attempted to recall the witness.  Therefore, the injury of which Petitioner complains was the result of the conduct of his own counsel and counsel for the co-defendant, and not the trial court's ruling on the objection.

Respondent contends that Petitioner's claim is foreclosed because there is no clearly established federal law concerning the exclusion of evidence in the context of the present case, which relates to the exclusion of expert testimony.

It is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court.  Harrington v. Richter, 131 S.Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  A specific legal rule may not be inferred from Supreme Court precedent merely because such a rule might be logical in light of that

precedent; rather, the Supreme Court case itself must have "squarely" established that specific legal rule.  <u>Richter</u>, 131 S.Ct. at 786; <u>Knowles v. Mirzayance</u>, 129 S.Ct. 1411, 1419 (2009). Further, the Supreme Court itself must have applied the specific legal rule to the context in which the petitioner's claim arises. <u>Premo v. Moore</u>, 131 S.Ct. 733, 743 (2011); <u>Carey v. Musladin</u>, 549 U.S. 70, 75-76 (2006) (the Court's application to government practices of a legal rule concerning wearing prison clothing at trial does not clearly establish that the rule applies to private conduct of spectators).

In arguing the absence of clearly established federal law, Respondent relies on <u>Moses v. Payne</u>, 555 F.3d 742 (9th Cir. 2009), which upheld as not contrary to clearly established federal law the exclusion of the defendant's expert witness's testimony regarding the victim's depression.

The state court rule in operation in <u>Moses v. Payne</u> admitted expert testimony if it would assist the trier of fact to understand the evidence or a fact in issue, such as when the testimony concerned matters beyond the common knowledge of the average layperson and was not misleading.  <u>Id.</u> at 756.  The court considered whether clearly established federal law governed the state court's decision excluding the evidence as cumulative and not sufficiently probative to outweigh likely prejudice and confusion.  The court noted that the Supreme Court's decisions did not squarely address the issue of whether a rule requiring a trial court to balance factors and exercise its discretion infringed upon a weighty interest of the accused or was arbitrary or disproportionate to the purposes it was designed to serve.  <u>Id</u>

1   at 758.  However, the court noted that the state rule in issue
2   was a well established rule of evidence that permitted a trial
3   court to exercise its discretion in admitting expert testimony
4   when relevant, and thus it was "more analogous to" evidentiary
5   rules approved in Holmes v. South Carolina, 547 U.S. 319, that
6   excluded evidence where probative value was outweighed by unfair
7   prejudice, confusion of issues, or potential to mislead the jury.
8   Moses v. Payne, 555 F.3d at 758.

9       The court in Moses noted that evidentiary rules held to be
10  constitutionally offensive by the Supreme Court were rules that
11  by their own terms required the exclusion of crucial evidence,
12  such as testimony of a defendant or key percipient witnesses, or
13  all evidence relating to a crucial defense, that had a critical
14  effect on the trial with little or no corresponding rational
15  justification.  Id.  However, the ruling by the trial court at
16  issue in Moses was actually an exercise of discretion to exclude
17  expert testimony.  The court in Moses concluded that Supreme
18  Court cases did not 1) squarely address whether a court's
19  exercise of discretion to exclude expert testimony violates a
20  criminal defendant's constitutional right to present relevant
21  evidence, or 2) clearly establish a controlling legal standard
22  for evaluating discretionary decisions to exclude the type of
23  evidence at issue.  Id. at 758-79.  Thus, the state court's
24  decision upholding the trial court's discretionary exclusion of
25  the expert testimony could not have been, and thus was not,
26  contrary to, or an unreasonable application of, clearly
27  established Supreme Court precedent.  Id. at 759.

28      Based on the analysis set forth in Moses v. Payne, the state

court's decision upholding the trial court's discretionary

exclusion of expert testimony concerning interviewing young

children was not contrary to, or an unreasonable application of,

clearly established federal law.

However, even if the Supreme Court's general due process

standard were considered to be clearly established federal law

governing state court discretionary decisions concerning the

exclusion of expert testimony, Petitioner has not shown that the

state court's decision in the present case was contrary to, or an

unreasonable application of, clearly established federal law.

As the state court noted, the evidence lacked the necessary

relevance and materiality for its exclusion to offend due

process.  The issues pertinent to the question of determining

what homicidal offense had been committed related to Petitioner's

state of mind, which Petitioner argued was one of extreme

emotional pain and impulsive reactivity.  The subject of the

difficulty of interviewing young children related to Petitioner's

state of mind only tangentially.  Information that special

interviewing techniques or considerations arose with young

children could reflect on the thoroughness and accuracy of

Officer Briggs' evaluation of the child, which in turn would tend

to show that the officer's understanding of the events

experienced by the child was unreliable.  If the officer's

understanding that the child did not claim to have been touched

inappropriately was shown to have been unreliable, the

defendant's claim of having a basis for impulsive conduct may

have been strengthened slightly.

///

However, whether or not the daughter had been molested, or, more directly, whether or not the officer was told by the child that she was molested, were not the ultimate issues in the case. Instead, the decisive questions concerned whether the Petitioner acted with malice or had instead acted in the sudden heat of passion with sufficient provocation. Under the instructions given, the jury had to determine the weight and significance of any provocation, which could reduce murder to voluntary manslaughter if because of a sudden quarrel or in the heat of passion 1) the defendant was provoked, 2) as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his or her reasoning or judgment, and 3) the provocation would have caused an ordinary person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. (2 CT 265, 291-92.) The jury was told that the defendant must have acted under the direct and immediate influence of the provocation. In deciding the sufficiency of the provocation, the jury had to consider whether an ordinary person of average disposition would have been provoked, and how such a person would react in the same situation knowing the same facts. (Id. at 292.)

The evidence showed that on the morning in question, Petitioner and his wife engaged in multiple acts consistent with the sudden discovery, and subjectively sincere belief, that their daughter had been molested, including reporting the matter to law enforcement and to the landlord's agent and seeking medical attention. The daughter's failure to give a full account of what

she experienced to the officer did not detract from the nature of
the provocation presented to Petitioner, namely, that the
daughter had experienced nightmares in which she begged not to be
touched, she referred to seeing the hair of the victim, and she
had reported having been touched and hurt by the victim; further,
the victim was angered by the accusation.  The psychologist
opined that Petitioner's concern that his daughter had been
molested was reasonable under the circumstances.  The central
question was not whether the daughter had actually been molested
or whether the daughter repeated the same matters to the officer;
the question was "if the killer's reason was actually obscured as
the result of a strong passion aroused by a 'provocation'
sufficient to cause an ' "ordinary [person] of average
disposition... to act rashly or without due deliberation and
reflection, and from this passion rather than judgment." '"
People v. Breverman, 19 Cal.4th 142, 163 (1998).

     Thus, what the child told the officer or the correct
protocol for a law enforcement officer interviewing a child were
not relevant to the issues of state of mind or were only
tangentially relevant at best; likewise, this evidence was not
material to the issues.  A fair-minded jurist could therefore
conclude that no weighty interest of Petitioner was infringed.

     Further, the exclusion advanced goals related to the
administration of justice.  Dr. Seymour had testified that young
children were difficult interview subjects, and defense counsel
had elicited testimony from Officer Briggs that he did not ask
the child about "spiders," and he lacked special training or
course work concerning the interviewing or the psychology of

children.  Significant evidence concerning these tangentially
relevant matters was in the record.  A fair-minded jurist could
conclude that the exclusion of the evidence furthered recognized
values related to the administration of justice by avoiding
repetition and eliminating only marginally relevant evidence to
avoid confusion of the issues and misleading the jury.  It was
reasonable for the state court to conclude that the exclusion of
the testimony was not arbitrary or disproportionate.

In any event, the exclusion of the evidence did not have a
substantial and injurious effect or influence in determining the
jury's verdict.  The parties have not pointed to any offer of
proof concerning what the testimony of the expert would have
been, so the precise matter that was excluded is unclear, and the
effect of the exclusion is thus speculative.  Evidence concerning
the proper methodology for interviewing a child would not have
bolstered or undercut the reasonableness of Petitioner's belief
that his child was molested, which was based not on an interview,
but rather on his daughter's nightmares, statements, and other
behavior.  Extensive evidence of malice was before the jury.
Multiple sources of evidence revealed that it was Petitioner who
sought out the victim and inflicted the multiple stab wounds;
thus, it was clear that Petitioner voluntarily advanced on the
victim and killed him.  Petitioner's purchase of a knife and bat,
the type of instruments used in the killing, and his aggressive
confrontation of the victim with the weapons amply supported the
finding that the murder was premeditated.

In sum, the state court's decision that exclusion of the
evidence did not violate Petitioner's right to present a defense

1  was not contrary to, or an unreasonable application of, clearly
2  established federal law within the meaning of § 2254(d)(1).

3      VII.   <u>Instruction on Voluntary Manslaughter</u>

4      Petitioner argues that his rights to present a complete
5  defense and to a fair trial under the Fifth and Fourteenth
6  Amendments were violated by the trial court's failure to instruct
7  the jury correctly on voluntary manslaughter.  Petitioner
8  premises his argument on the failure of the trial court's
9  instruction to inform the jury that voluntary manslaughter
10  requires either an intent to kill or a conscious disregard for
11  life.

12      A.   <u>The State Court Decision</u>

13      The pertinent portion of the opinion of the CCA is as
14  follows:

15      IV. Jury Instructions

16      Charlotte, joined by Edward, contends the trial court
    denied her federal and state constitutional rights to
17      due process, a fair trial, and to present a defense,
    because the jury instructions on voluntary manslaughter
18      were defective. Specifically, Charlotte asserts the
    court erred in not specifically instructing the jury
19      that a defendant who, with the intent to kill or with
    conscious disregard for life, unlawfully kills in
20      unreasonable self-defense or defense of others, or in
    the heat of passion, is guilty of voluntary
21      manslaughter. We conclude there was no error in the
    instructions given.
22
    A. Instructions Given to the Jury
23
24      The trial court instructed the jury with a series of
    instructions on homicide, as follows:

25          "[CALCRIM No. 500] Homicide is the killing of
        one human being by another. Murder is a type
26          of homicide. The defendants are charged with
        murder. [¶] A homicide can be lawful or
27          unlawful. If a person kills with a legally
        valid excuse or justification, the killing is
28          lawful, and he or she has not committed a

crime. If there is no legally valid excuse or
justification, the killing is unlawful and,
depending on the circumstances, the person is
guilty of either murder or manslaughter. You
must decide whether the killing in this case
was unlawful and, if so, what specific crime
was committed."

"[CALCRIM No. 520] The defendants are charged
in Count I with murder. To prove that a
defendant is guilty of this crime, the People
must prove that: [¶] One, the defendant
committed an act that caused the death of
another person; [¶] Two, when the defendant
acted, he or she had a state of mind called
malice aforethought; and, [¶] Three, he or
she killed without lawful excuse or
justification. [¶] There are two kinds of
malice aforethought, express malice and
implied malice. Proof of either is sufficient
to establish the state of mind required for
murder. The defendant acted with express
malice if he or she unlawfully intended to
kill. [¶] The defendant acted with implied
malice if: [¶] One, he or she intentionally
committed an act; [¶] Two, the natural
consequences of the act were dangerous to
human life; [¶] Three, at the time he or she
acted, he or she knew his act was dangerous
to human life; and, [¶] Four, he or she
deliberately acted with conscious disregard
for human life. [¶] Malice aforethought does
not require hatred or ill will toward the
victim. It is a mental state that must be
formed before the act that causes death is
committed. It does not require deliberation
or the passage of any particular period of
time."

The court further instructed with CALCRIM No. 521,
on the degrees of murder, and CALCRIM No. 522,
on the effect of provocation.

The court also instructed the jury on voluntary
manslaughter based on heat of passion (pursuant to
CALCRIM No. 570), as follows:

"A killing that would otherwise be murder is
reduced to voluntary manslaughter if the
defendants killed someone because of a sudden
quarrel or in the heat of passion. A
defendant killed someone because of a sudden
quarrel or in the heat of passion if: [¶]
One, the defendant was provoked; [¶] Two, as
a result of the provocation, the defendant

acted rashly and under the influence of
intense emotion that obscured his or her
reasoning or judgment; and, [¶] Three, the
provocation would have caused an ordinary
person of average disposition to act rashly
and without due deliberation, that is, from
passion rather than from judgment.

"Heat of passion does not require anger, rage
or any specific emotion. It can be any
violent or intense emotion that causes a
person to act without due deliberation and
reflection. [¶] In order for heat of passion
to reduce a murder to voluntary manslaughter,
the defendant must have acted under the
direct and immediate influence of provocation
as I have defined it. While no specific type
of provocation is required, slight or remote
provocation is not sufficient. Sufficient
provocation may occur over a short or long
period of time. [¶] It is not enough that the
defendant simply was provoked. The defendant
is not allowed to set up his or her own
standard of conduct. You must decide whether
the defendant was provoked and whether the
provocation was sufficient. In deciding
whether the provocation as sufficient,
consider whether an ordinary person of
average disposition would have been provoked
and how such a person would react in the same
situation knowing the same facts. [¶] If
enough time passed between the provocation
and the killing for an ordinary person of
average disposition to "cool off" and regain
his or her clear reasoning and judgment, then
the killing is not reduced to voluntary
manslaughter on this basis.

"The People have the burden of proving beyond
a reasonable doubt that the defendant did not
kill as the result of a sudden quarrel or in
the heat of passion. If the People have not
met this burden, you must find the defendant
not guilty of murder."

Finally, the court instructed the jury on imperfect
self-defense and imperfect defense of others (pursuant
to CALCRIM No. 571), as follows:

"A killing that would otherwise be murder is
reduced to voluntary manslaughter if a
defendant killed a person because he or she
acted in "imperfect self-defense" or
"imperfect defense" of another. [¶] If you
conclude that defendant Charlotte Gutierrez

acted in complete "defense of another,"
defendant Edward Gutierrez, her action was
lawful and you must find her not guilty of
any crime. The difference between complete
"defense of another" and "imperfect
self-defense" or "imperfect defense of
another" depends upon whether a defendant's
belief in the use of deadly force was
reasonable.

"Defendant Edward Gutierrez acted in
"imperfect self-defense" if: [¶] One,
Defendant Edward Gutierrez actually believed
that he was in imminent danger of being
killed or suffering great bodily injury; and
[¶] Two, Defendant Edward Gutierrez actually
believed that the immediate use of deadly
force was necessary to defend against the
danger; but, [¶] Three, at least one of those
beliefs was unreasonable.

"Defendant Charlotte Gutierrez acted in
"imperfect defense of another" if: [¶] One,
Defendant Charlotte Gutierrez actually
believed that Defendant Edward Gutierrez was
in imminent danger of being killed or
suffering great bodily injury; and [¶] Two,
Defendant Charlotte Gutierrez actually
believed that the immediate use of deadly
force was necessary to defend against that
danger; but, [¶] Three, at least one of those
beliefs was unreasonable.

"Belief in future harm is not sufficient, no
matter how great or how likely the harm is
believed to be. [¶] In evaluating a
defendant's beliefs, consider all the
circumstances as they were known and appeared
to a defendant. [¶] Great bodily injury means
significant or substantial physical injury.
It is an injury that is greater than minor or
moderate harm.

"The People have the burden of proving beyond
a reasonable doubt that defendant Edward
Gutierrez was not acting in "imperfect
self-defense" or that defendant Charlotte
Gutierrez was not acting in "imperfect
defense of another." If the People have not
met this burden, you must find such defendant
not guilty of murder."

B. Analysis

Our standard of review is de novo, since the question

52

is one of law involving the determination of applicable
legal principles. (*Alvarez, supra*, 14 Cal.4th at p.
217.)

A killing is voluntary manslaughter if a person
intentionally kills either in unreasonable self-defense
or in a sudden quarrel or heat of passion. (*People v.
Blakeley* (2000) 23 Cal.4th 82, 88 *(Blakeley); People v.
Lasko* (2000) 23 Cal.4th 101, 107-108). An unintentional
killing may also be voluntary manslaughter when the
defendant, acting with conscious disregard for life and
the knowledge that the conduct is life-endangering,
either (1) unintentionally kills while having an
unreasonable but good faith belief in the need to act
in self-defense (*Blakeley, supra*, 23 Cal.4th at pp.
88-91 *(Blakeley)*, or (2) unintentionally but unlawfully
kills in a sudden quarrel or heat of passion *(Lasko,
supra*, 23 Cal.4th at pp. 108-111 *(Lasko)*. *(People v.
Genovese* (2008) 168 Cal.App.4th 817, 829 *(Genovese)*.)
Voluntary manslaughter may also be committed when a
person kills in imperfect defense of another, i.e. in
the actual but unreasonable belief he must defend
another from imminent danger of death or great bodily
injury. (*People v. Randle* (2005) 35 Cal.4th 987, 990.)
Thus, either intent to kill or a conscious disregard
for life is an essential requirement of voluntary
manslaughter. (*Blakeley, supra*, 23 Cal.4th at pp.
88-91; *Lasko, supra*, 23 Cal.4th at pp. 108-109.)

Charlotte argues the instructions did not inform the
jurors they could find her guilty of voluntary
manslaughter if they found that she, while acting in
imperfect defense of another, or in sudden quarrel or
heat of passion, killed *either* intentionally *or*
unintentionally with conscious disregard for human life.
She asserts the trial court should have expressly
instructed the jury, in accordance with *Blakely* and
*Lasko*, that intent to kill or conscious disregard for
life is an essential element of voluntary manslaughter,
and the failure to so instruct left the jurors with no
way to apply her proffered defense to the elements of
express or implied malice to ascertain whether these
elements had been proven beyond a reasonable doubt. We
disagree.

This issue was recently addressed and rejected by the
Third District Court of Appeal in *Genovese, supra*, 168
Cal.App.4th at pp. 831-832. There, the court noted that
while the jury was not expressly instructed in this
manner, "the jury *was* instructed, 'A killing *that would
otherwise be murder* is reduced to voluntary
manslaughter if the defendant killed a person because
he acted in imperfect defense of another.' (Italics
added) Similarly, the jury was instructed, 'A killing
*that would otherwise be murder* is reduced to voluntary

manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion .'" (*Id*. at p. 831.) The court explained that "[t]he killing could not 'otherwise be murder' unless the jury found defendant intended to kill the victim or acted with conscious disregard for human life, and the jury was so informed in the instruction defining murder (i.e., that to prove murder, the prosecution must prove defendant acted with malice aforethought, and there are two kinds of malice forethought-express, which requires intent to kill, and implied, which requires conscious disregard for human life)." (*Id*. at pp. 831-832.) Consequently, the court concluded the instructions did let the jury know that killing in imperfect self-defense, or in sudden quarrel or heat of passion, whether intentional or in conscious disregard of life, is voluntary manslaughter. (*Id*. at p. 832.)

The *Genovese* court also rejected the defendant's argument that the language in the CALCRIM instructions that "'killing that would otherwise be murder' was faulty for failing to inform the jury that voluntary manslaughter could be found despite the existence of an intent to kill or conscious disregard for life." (*Genovese, supra*, 168 Cal.App.4th at p. 832.) The defendant had pointed out that intent to kill or conscious disregard for life had been expressly stated as an essential element of voluntary manslaughter in CALJIC No. 8.40, which defined voluntary manslaughter and said that every person who unlawfully kills another human being without malice aforethought but either with an intent to kill or with conscious disregard for human life was guilty of voluntary manslaughter. The court noted that language similar to CALJIC No. 8.40 now appears in CALCRIM No. 572, which defines voluntary manslaughter when murder is not charged, but in the case before it, murder was charged with voluntary manslaughter as a lesser offense. (*Genovese, supra*, 168 Cal.App.4th at p. 832.) The court concluded the defendant's argument that once the jury determined that express or implied malice was present, they were not told that they could still find the defendant guilty of voluntary manslaughter if they believed he acted in heat of passion or reasonable/unreasonable defense of another, was "defeated by the plain language of the instructions as given to the jury, that '[a] killing that would otherwise be murder is reduced to voluntary manslaughter' if defendant acted in imperfect defense of another or sudden quarrel or heat of passion." (*Ibid.*)

We agree with the reasoning in *Genovese*, which applies to the present case. As in *Genovese,* the jury here was instructed that a killing "that would otherwise be murder" is reduced to voluntary manslaughter if a

defendant killed a person in imperfect defense of
another or in a sudden quarrel or heat of passion, and
that the killing could not "otherwise be murder" unless
the jury found a defendant either had intended to kill
the victim or acted with conscious disregard for human
life. Thus, the instructions did let the jury know that
a killing in imperfect defense of another or in a
sudden quarrel or heat of passion, whether intentional
or in conscious disregard of life, is voluntary
manslaughter. Accordingly, we concluded there was no
error in the jury instructions on voluntary
manslaughter.

People v. Gutierrez, 2009 WL 765680 at *22-*26.

B.   Analysis

In the present case, Respondent characterizes Petitioner's claim as one pertaining to the right to have instruction on a lesser included offense.  Respondent then argues that there is no clearly established federal law requiring instruction on lesser included offenses.

As a preliminary matter, it is necessary to clarify the legal basis of the claim and the pertinent legal principles. When a conviction is challenged in a proceeding pursuant to 28 U.S.C. § 2254 on the basis of error in jury instructions, a district court's review is informed by two clearly established rules.

First, the United States Supreme Court has held that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  A claim that an instruction was deficient in comparison to a state model or that a trial judge incorrectly interpreted or applied state law governing jury instructions does not entitle one to relief under § 2254, which requires violation of the

Constitution, laws, or treaties of the United States.  28 U.S.C.
§§ 2254(a), 2241(c)(3).  Thus, to the extent that Petitioner's
claim is based on a state law error, Petitioner fails to state a
claim that would entitle him to relief in this proceeding.

However, it does not appear that Petitioner is asserting a
state law claim or even a federal claim based on the failure to
instruct <u>sua</u> <u>sponte</u> on a lesser included offense; rather,
Petitioner appears to be challenging the overall fairness or
accuracy of the instructions actually given in light of the
defense theory of the case.

This contention brings into operation the second overarching
legal principle that governs review of instructional error
undertaken pursuant to § 2254.  The only basis for federal
collateral relief for instructional error is that the infirm
instruction or the lack of instruction by itself so infected the
entire trial that the resulting conviction violates due process.
<u>Estelle</u>, 502 U.S. at 72; <u>Cupp v. Naughten</u>, 414 U.S. 141, 147
(1973); <u>see</u>, <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)
(noting that it must be established not merely that the
instruction was undesirable, erroneous or even "universally
condemned," but that it violated some right guaranteed to the
defendant by the Fourteenth Amendment).  Further, an instruction
may not be judged in artificial isolation, but must be considered
in the context of the instructions as a whole and the trial
record.  <u>Estelle</u>, 502 U.S. at 72.  In addition, in reviewing an
ambiguous instruction, it must be determined whether there is a
reasonable likelihood that the jury has applied the challenged
instruction in a way that violates the Constitution.  <u>Estelle</u>,

1   502 U.S. at 72-73 (reaffirming the standard as stated in Boyde v.

2   California, 494 U.S. 370, 380 (1990)).  The Court in Estelle

3   emphasized that the Court had defined the category of infractions

4   that violate fundamental fairness very narrowly, and that beyond

5   the specific guarantees enumerated in the Bill of Rights, the Due

6   Process Clause has limited operation.  Id. at 72-73.

7        Finally, as previously noted, under the Due Process Clause

8   of the Fourteenth Amendment and the Compulsory Process Clause and

9   Confrontation Clause of the Sixth Amendment, criminal defendants

10  must be afforded a meaningful opportunity to present a complete

11  defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986); California

12  v. Trombetta, 467 U.S. 479, 485 (1984).  The Supreme Court has

13  characterized its cases as not recognizing a generalized

14  constitutional right to have a jury instructed on a defense

15  available under the evidence under state law.  See, Gilmore v.

16  Taylor, 108 U.S. 333, 343 (1993).  However, when habeas is sought

17  under 28 U.S.C. § 2254, a failure to instruct on the defense

18  theory of the case constitutes error if the theory is legally

19  sound and evidence in the case makes it applicable.  Clark v.

20  Brown, 450 F.3d 898, 904 (9th Cir. 2006); see, Mathews v. United

21  States, 485 U.S. 58, 63 (1988) (reversing a conviction and

22  holding that even if a defendant denies one or more elements of

23  the crime, he is entitled to an entrapment instruction whenever

24  there is sufficient evidence from which a reasonable jury could

25  find entrapment, and the defendant requests such an instruction).

26       A habeas petitioner must show that the alleged instructional

27  error had substantial and injurious effect or influence in

28  determining the jury's verdict.  Clark v. Brown, 450 F.3d at 905;

57

1   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  However, such an

2   error has been held harmless under the Brecht standard where

3   other instructions permitted consideration of the pertinent

4   defensive matter.  Beardslee v. Woodford, 358 F.3d 560, 576 (9th

5   Cir. 2004) (holding that failure to instruct on manslaughter was

6   not error, but if error was harmless because it had no

7   substantial or injurious effect or influence in determining the

8   jury's verdict where numerous instructions allowed the jury to

9   consider the effect of threats upon the accused's mental state,

10  both as an absolute defense to all charges and as a factor in

11  choosing between first and second degree murder; the jury had

12  been given more than the simple all-or-nothing choice at issue in

13  Beck v. Alabama, 447 U.S. 625, 638-46 (1980); and the jury's

14  decision to reject second degree murder meant that they would not

15  have accepted the lesser charge of manslaughter).

16      As noted above, the state court had previously articulated

17  the law concerning a right to a meaningful opportunity to present

18  a defense based on the Sixth Amendment's compulsory process and

19  due process requirements.  People v. Gutierrez, 2009 WL 765680 at

20  *18.  The state court examined the totality of the instructions

21  given concerning murder, malice, provocation, heat of passion,

22  and imperfect defensive privileges.  It then reviewed the

23  pertinent state law, which, consistent with the instructions

24  given, reflected that either intent to kill or acting with a

25  conscious disregard for life would constitute malice, the

26  essential state of mind element for murder.  The state court then

27  determined that the instruction that a killing "that would

28  otherwise be murder" was voluntary manslaughter informed the jury

1   that a killing in a sudden quarrel, heat of passion, or in
2   imperfect self-defense was voluntary manslaughter whether it was
3   intentional or a result of acting with a conscious disregard for
4   human life.

5       In sum, the state court articulated the correct legal
6   standard and undertook an analysis of the challenged instruction
7   in light of all the instructions given.  The state court
8   reasonably concluded that other instructions augmented or
9   explained the challenged instruction.  Given the state court's
10  approval of the analysis that the plain language of the
11  instructions defeated the Petitioner's contention, the state
12  court implicitly concluded that it was not reasonably likely that
13  the jury had applied the challenged instruction in a way that
14  violated the Constitution.  The state court's decision was not
15  contrary to, or an unreasonable application of, clearly
16  established federal law.

17      Further, Petitioner has not shown the requisite prejudice.
18  The jury was instructed on the lesser included offense of second
19  degree murder to the effect that acting willfully, deliberately,
20  and with premeditation was classified as first degree.
21  Specifically, the jury was instructed that acting deliberately
22  involved carefully weighing the considerations for and against
23  the choice and deciding to kill knowing the consequences, and
24  that acting with premeditation was deciding to kill before
25  committing the act that caused the death.  The jury was also told
26  that a decision to kill made rashly, impulsively, or without
27  careful consideration was not deliberate and premeditated.  (1 CT
28  290-91.)  However, the jury returned with a verdict of first

degree murder.  Thus, it appears that the jury necessarily rejected Petitioner's defensive theory of impulsive action despite having been given a clear choice.  (2 CT 311.)  Under these circumstances, the alleged instructional error did not have a substantial and injurious effect or influence in determining the jury's verdict.

In sum, the Court concludes that the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law within the meaning of § 2254(d)(1).  Accordingly, the petition should be denied.

VIII.  <u>Cumulative Error</u>

Petitioner appears to argue in the petition that in assessing prejudice, this Court should consider the combined or cumulative prejudice of all the Constitutional violations alleged by Petitioner.  (Pet. 10:17-24.)  Petitioner did not set forth this argument as a separate argument heading, but rather simply referred to it in briefing the standard of review.  Respondent did not respond to this assertion as a separate claim.

The Court understands Petitioner's argument to relate to the evaluation of prejudice stemming from the due process violations raised in the petition.  The Court has concluded that the state court decision finding that no Constitutional violations occurred was not contrary to, or an unreasonable application of, clearly established federal law.  However, even if all the alleged Constitutional violations were considered cumulatively, Petitioner has not shown that they had a substantial and injurious effect or influence in determining the jury's verdict.
///

1        IX.   Request for Evidentiary Hearing

2        Petitioner requests an evidentiary hearing with respect to

3   all issues.   (Trav., doc. 24, 8-9.)

4        The decision to grant an evidentiary hearing is generally a

5   matter left to the sound discretion of the district courts.   28

6   U.S.C. § 2254; Habeas Rule 8(a); Schriro v. Landrigan, 550 U.S.

7   465, 473 (2007).   To obtain an evidentiary hearing in federal

8   court under the AEDPA, a petitioner must allege a colorable claim

9   by alleging disputed facts which, if proved, would entitle him to

10  relief.   Schriro v. Landrigan, 550 U.S. at 474.

11       The determination of entitlement to relief is, in turn, is

12  limited by 28 U.S.C. § 2254(d)(1), which requires that to obtain

13  relief with respect to a claim adjudicated on the merits in state

14  court, the adjudication must result in a decision that was either

15  contrary to, or an unreasonable application of, clearly

16  established federal law.   Schriro v. Landrigan, 550 U.S. at 474.

17  Further, in analyzing a claim pursuant to § 2254(d)(1), a federal

18  court is limited to the record that was before the state court

19  that adjudicated the claim on the merits.   Cullen v. Pinholster,

20  131 S.Ct. 1388, 1398 (2011).

21       Thus, an evidentiary hearing may be granted with respect to

22  a claim adjudicated on the merits in state court where the

23  petitioner satisfies § 2254(d)(1), or where § 2254(d)(1) does not

24  apply, such as where the claim was not adjudicated on the merits

25  in state court.   Cullen v. Pinholster, 131 S.Ct. at 1398, 1400-

26  01.   Where, as here, a state court record precludes habeas relief

27  under the limitations set forth in § 2254(d), a district court is

28  not required to hold an evidentiary hearing.   Cullen v.

<u>Pinholster</u>, 131 S.Ct. 1388, 1399 (2011) (citing <u>Schriro v.</u>
<u>Landrigan</u>, 550 U.S. 465, 474 (2007)).

Accordingly, it will be recommended that the request for an evidentiary hearing be denied.

X.   <u>Certificate of Appealability</u>

A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases. It will be assumed for the purpose of the following analysis that the Court will decide to enter a final order adverse to the Petitioner.

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003).  A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right.  § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336 (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district

1  court was correct in any procedural ruling.  <u>Slack v. McDaniel</u>,

2  529 U.S. 473, 483-84 (2000).

3      In determining this issue, a court conducts an overview of

4  the claims in the habeas petition, generally assesses their

5  merits, and determines whether the resolution was debatable among

6  jurists of reason or wrong.  <u>Id.</u>  It is necessary for an

7  applicant to show more than an absence of frivolity or the

8  existence of mere good faith; however, it is not necessary for an

9  applicant to show that the appeal will succeed.  <u>Miller-El v.</u>

10 <u>Cockrell</u>, 537 U.S. at 338.

11     Here, it does not appear that reasonable jurists could

12 debate whether the petition should have been resolved in a

13 different manner.  Petitioner has not made a substantial showing

14 of the denial of a constitutional right.

15     Accordingly, it will be recommended that the Court decline

16 to issue a certificate of appealability.

17     XI.  <u>Recommendations</u>

18     Accordingly, it is RECOMMENDED that:

19     1) Petitioner's request for an evidentiary hearing be

20 DENIED; and

21     2)  The petition be DENIED; and

22     3)  Judgment be ENTERED for Respondent; and

23     4)  The Court DECLINE to issue a certificate of

24 appealability.

25     These findings and recommendations are submitted to the

26 United States District Court Judge assigned to the case, pursuant

27 to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

28 the Local Rules of Practice for the United States District Court,

Eastern District of California.   Within thirty (30) days after
being served with a copy, any party may file written objections
with the Court and serve a copy on all parties.   Such a document
should be captioned "Objections to Magistrate Judge's Findings
and Recommendations."   Replies to the objections shall be served
and filed within fourteen (14) days (plus three (3) days if
served by mail) after service of the objections.   The Court will
then review the Magistrate Judge's ruling pursuant to 28 U.S.C.
§ 636 (b)(1)(C).   The parties are advised that failure to file
objections within the specified time may waive the right to
appeal the District Court's order.   <u>Martinez v. Ylst</u>, 951 F.2d
1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    October 21, 2012**                    /s/ Sheila K. Oberto
UNITED STATES MAGISTRATE JUDGE